IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. PD-0862-05






MICHAEL SCOTT, Appellant



v.



THE STATE OF TEXAS


 




ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW


FROM THE THIRD COURT OF APPEALS


TRAVIS COUNTY





 Price, J., delivered the opinion of the Court, in which Womack, Johnson,
Holcomb and Cochran, J.J., joined. Keller, P.J., filed a dissenting opinion in which
Meyers, Keasler and Hervey, J.J., joined. 



O P I N I O N



 The appellant, Michael Scott, was convicted of the offense of murder in the course
of a robbery or burglary, a capital offense, for his involvement in the so-called "Yogurt Shop
Murders" that occurred in Austin in December of 1991. In a prior, separate trial, his co-defendant, Robert Springsteen, was also convicted of capital murder for this offense, and
sentenced to death. After the United States Supreme Court declared that the execution of
juvenile offenders violates the Eighth Amendment, in Roper v. Simmons, (1) the Governor
commuted Springsteen's death sentence to a term of life in prison. The jury in the
appellant's case, however, answered the first special issue in such a way that the trial court
was obliged to sentence him in the first instance to life imprisonment. (2) Accordingly, the
appellant prosecuted his appeal in the Third Court of Appeals.

 Among the issues that the appellant raised on appeal was the claim that the trial court
erred to admit evidence of the content of Springsteen's statement to the police over the
appellant's objection that this violated his rights under the Confrontation Clause of the Sixth
Amendment. In a published opinion, the court of appeals acknowledged that the trial court
erred, under Crawford v. Washington, (3) to admit the content of the statement into evidence
during the appellant's trial, but held the error to be harmless under the constitutional-harm
analysis embodied in Rule 44.2(a) of the Texas Rules of Appellate Procedure. (4) We refused
the State's petition for discretionary review, which challenged the holding of the court of
appeals that constitutional error occurred. But we granted the appellant's petition for
discretionary review in which he challenges the court of appeals's determination that the
constitutional error was harmless beyond a reasonable doubt. (5)

 Since granting the appellant's petition for discretionary review, we have resolved
Springsteen's direct appeal. (6) In an unpublished opinion, we reversed Springsteen's
conviction and remanded his cause for a new trial, holding that his trial court erred under
Crawford to admit excerpts of the appellant's statement to police into evidence against him,
expressly finding that this error was not harmless beyond a reasonable doubt. (7) Our holding
in Springsteen's appeal does not, of course, mandate that we reverse the judgment of the
court of appeals in the appellant's case. Nevertheless, on the particular facts of the
appellant's case, as developed at his separate trial, we hold that the court of appeals did err
to find the constitutional error to be harmless, and we therefore reverse the lower court's
judgment and remand the cause for a new trial.

THE FACTS AND PROCEDURAL POSTURE


The Undisputed Facts (8)


 At 11:47 p.m. on the night of Friday, December 6, 1991, firefighters were called to
the "I Can't Believe It's Yogurt" shop (hereinafter, "yogurt shop") in north Austin. In the
back of the burning establishment they found the nude bodies of four teenage girls:
seventeen-year-old Eliza Thomas and Jennifer Harbison, who both worked at the yogurt
shop; fifteen-year-old Sarah Harbison, Jennifer's sister; and Sarah's thirteen-year-old friend,
Amy Ayers. The .22 caliber wound to the top of Amy's head was not fatal, but she had been
shot a second time in the back of the head with a .380 caliber weapon, which killed her. (9) 
The other three were shot fatally in the back of the head with a .22 caliber weapon. Amy's
body was located apart from the other three, on her stomach. A knotted t-shirt was found
beneath her. She had a bruise on the inside of her lip which was consistent with a blow or
a fall. Eliza's body had been "stacked" on top of Sarah's, and Jennifer's body was
discovered nearby, under circumstances suggesting she may also have been "stacked" upon
the other two but had somehow rolled off during the fire. All four bodies were burned to
varying degrees. Amy and Jennifer had ligatures around their necks, and Jennifer's hands
were found behind her back, as if she had been bound, though no binding was discovered. 
Eliza's hands were tied behind her back with a bra, and Sarah's were similarly bound with
a pair of panties. Both Eliza and Sarah had been gagged. (10) There was evidence that Sarah
had been sexually assaulted, and a metal scoop lay on the floor between her legs. (11)

 The front door of the yogurt shop was locked, with a single key in the door on the
inside. The girls had obviously been in the middle of their closing-up routine when the
killings occurred. The firefighters discovered that the back door, which ordinarily remained
closed and locked throughout the evening shift, had been left "cracked open," apparently by
the assailants. Although all four .22 caliber bullets, and a .380 caliber bullet and shell
casing, were recovered, the police were never able to match them forensically to any
particular weapon. An office in the back of the store remained locked and was never entered
during the offense. The revenue from the day shift had already been "dropped" into a "slot"
in the floor safe that was located in the locked office, but not the revenue from the night
shift. Some $540 was estimated to be missing from the night shift's business.

 Despite an extensive investigative effort, the crime went unsolved until, in September
of 1999, a task force that had been organized the year before to review the cold case decided
to re-interview the appellant, and after days of interrogation, obtained an inculpatory written
statement. Because there was no forensic evidence tying the appellant to the offense, the
State's case depended critically upon convincing the jury that his confession was reliable,
and over the course of a six-week guilt phase of trial, the defense team devoted the bulk of
its cross-examination and case-in-chief evidence to challenging that reliability.

The Appellant's Statement


 Eight days after the murders, on December 14, 1991, police had arrested sixteen-year-old Maurice Pierce at Northcross Mall, close to the yogurt shop, for possession of a .22
caliber pistol, along with Pierce's companion, fifteen-year-old Forrest Welborn. Police
questioned the two about the yogurt shop killings, and the next day they independently
questioned the appellant, and his roommate, Springsteen, as well. All denied any
involvement in the murders, and later forensic testing failed to establish the pistol as the
murder weapon. In 1998, police launched a review of the cold case, and the Pierce "tip" was
re-examined. On September 9, 1999, detectives arranged to question the appellant with
respect to his knowledge of Pierce's whereabouts on the night of the murders. Shortly into
the interview they began to suspect that the appellant was withholding information. Over
the course of the next six days, the appellant voluntarily submitted to lengthy interrogations
by three different detectives, in various combinations, culminating in a written statement he
gave to yet a fourth detective on September 14th, essentially summarizing the information
that police had elicited from him during those interrogations. The police recorded these
various interrogations, and eighteen hours of video and audio recordings were played for the
jury during trial.

 The appellant's written statement was introduced through the State's first witness and
read aloud to the jury. As it appears in the reporter's record, it reads in pertinent part:

 On December 6, 1991, I was with my friends Maurice, Rob
Springsteen, and Forrest. * * *

 

 We were at Northcross Mall sitting at a round table at the food court. 
Maurice brought up that he needed to get some money. I don't remember the
specifics about what was discussed, but I do know that this is what brought -
what brought what [sic] all this to be.


 Maurice and Rob talked * * * about robbing a place. They said this
would be the easiest way to get some money. * * *


 * * * I don't remember exactly what time it was, but it was still
daylight. We were all at the table when Maurice said we needed to go and
look around. I believed him to mean he wanted to find a place to rob.


 When we left, Maurice was driving his dad's gray Ford LTD. Rob was
sitting in the right front seat. I sat back behind the driver. Forrest was in the
back seat with me. We drove around and looked at the businesses around the
Northcross area. We drove up to the strip mall where the I Can't Believe It's
Yogurt shop was at. We looked at the businesses that were at the mall. 
Maurice was the one that said something like "lets go inside and take a look
at the yogurt shop."


 Maurice went in and bought a yogurt swirl, chocolate and vanilla. I
followed Rob inside. I sat down, and Rob came over and said something to
me and we got up and made it look like we were going to the restroom.


 Maurice was up at the counter talking to at least one of the girls. I
remember that he was talking to the dark-haired girl. Maurice was supposed
to distract them. Rob and I walked out the back and walked around to the
front of the building. When we got around to the front, Maurice was already
in the car eating his yogurt.


 We drove back to the mall and we sat at the same table. * * * We were
just talking, not about what was fixing to happen.


 * * *


 I walked around the mall with Rob. We ran into Maurice again when
we were walking around. Maurice told us that it was time to go. We got back
into his car. Maurice was driving. I was in the back seat, and Rob and Forrest
were in the car with us. We drove around the neighborhood more. I think we
were looking for a route to take and there was talk about how often the cops
drove around and if there was a general route they drove around in.


 I know it was dark when we left Northcross Mall. Most of the
businesses were closed when we got over to the yogurt shop. We drove across
the parking lot and drove through the alley behind the stores. We wanted to
see if there was any vehicles parked in the back, or if there were any people
back there. I believe we even wanted to see if the back double doors were still
slightly open.


 We drove back through the parking lot and then back to the rear of the
store. I remember the building was on the driver's side, the left side of the car. 
We stopped just past the double doors, not more that 50 feet past the doors. 
Maurice told Forrest that the only thing that he had to do was honk the horn
if anyone was coming.


 Maurice pulled out his gun. I believe that he had it in between the seat. 
I know Rob had a gun because he looked at it before we went inside to make
sure it was loaded. Before we went in Maurice told me to make sure that I
brought the can of Zippo lighter fluid. It was the bigger metal can. * * * I
believe Maurice wanted to use it to cover our tracks.


 We went into the back door. Maurice went in first, then Rob, and then
I followed them. One of the girls said something like, hey, you, what are you
doing? You don't belong in here. This girl was wearing a T-shirt I believe that
had the name "I Can't Believe it's Yogurt" on it.


 I believe that she was working in the back room when we entered the
back. Rob told me to stop and stay right there and not let anyone out the back. 
We were all surprised because we expected to find only two girls inside the
store and there were two other girls up at the front in the dining room area
sitting down. I could see the commotion going on up front. I remember
Maurice told me to check the front door to make sure it was locked. He also
told me to check to see if there was anyone out front that could see us.


 I checked the door and it was locked. There was one key in the lock. 
The door was locked. I looked outside to make sure no one was looking in. 
As this went along I got more and more scared. I heard the cash register open. 
I heard the drawer being lifted and slammed back. I saw Maurice at the cash
register and I saw him put something in his pocket. I thought to myself that
he had just put money in his pocket.


 All the girls were in the back with Rob. I looked out to check the front
again. I heard Maurice say something like "Where in the fuck is the rest of the
money?" I heard the girls crying and one of the girls said "That's all there is. 
It's already been dropped and you can't get to it."


 I heard Rob say, "Come help me with this." I went back there and he
wanted help tying them up. When I went back there I saw that all four girls
were naked. I believe this is the way that it was because I don't remember
pulling their clothes off. I went to the pile of clothes and picked up some
clothes to use to tie them up. I remember a T-shirt and a bra that we used to
tie them up.


 The girls were crying and whimpering. They were begging for us not
to kill them. They said they didn't want to die. I got a paper towel and put it
inside one of the girls' mouth. I remember that my finger pushed through the
towel when I was trying to stuff it in her mouth. This may not have worked
so I may have had to use something else to stuff in her mouth. It was white
like terry cloth. The girls were on their knees. I don't believe they were
standing up because I was looking down at them.


 Rob told me to check the front. I went up front and remember what
sounded like one of the girls trying to scream. Maurice was screaming saying
"Where the fuck is the rest of the money?" I heard a bang, a crack. It sounded
like a gun going off. I checked the lock one last time and turned around to see
what happened. One of the girls was already dead. I think Maurice shot that
one. After the shot, Maurice said again "Where in the fuck is the rest of the
money?" And there was a second shot.


 I went to the back and saw Rob, and he had one of the dark-haired girls
on her hands and knees and he's raping her, raping her hard. I told Rob that
this wasn't right. That's not what he came here for. Rob stood up, and I don't
know if he finished. I did not see his dick.


 I know that Maurice was not back there with Rob. Maurice had gone
into an office and he had one of the girls with him. He was squatting down
and I think she was trying to open a safe or something. Rob told me to do one
of the girls. I believe it was the one that he had just did.


 He told me not to be a pussy and told me if I didn't, then I was next. 
We laid the girl on the floor and I got on top of her. I tried to do her from the
front. I looked at her. I didn't want to look at her face. She had a piece of
white terry cloth towel on her mouth. I looked away because I didn't want to
see her. I couldn't get it up because I knew * * * that what I was doing was
wrong. I sort of faked it to make Rob think I did her. I got up and remember
either Maurice or Rob telling me to finish her.


 I remember grabbing the revolver from Maurice. He told me to finish
her. The girl was still on the floor and I pointed the gun at her and tried to
shoot it first but couldn't. Maurice told me to do it or I would be next. I
pointed the gun again at the girl and fired once into her head. I remember Rob
pushed me toward Maurice. Maurice was in the other room with the other
girl. I don't remember seeing a safe, but I don't remember what she was doing
down on the floor.


 I remember looking in the doorway and the gun is still in my hand. 
Maurice asked Rob if I did it, and Rob said "Yea, he finished her." Maurice
tole me, you are in this neck-deep already. I saw the side profile of this girl. 
She had like a white shirt on. I think she had dark hair. Rob was standing
right there and he had the small semiautomatic gun.


 Rob told me not to be a puss. I think I shot her in the head. I've been
not wanting to remember this. I know I have told you had [sic] something
different, but I did her too because Maurice and Rob were pressuring me. I
dropped the revolver. Maurice was mad at me. He asked me where the
lighter fluid was and I had thought I had left it in the car. He told me to go out
to the car and get it.


 I looked at Forrest and then I looked at the floorboard and picked up the
lighter fluid. Forrest did not say a word. I went back inside. Rob told me to
burn the place. I saw the girls laying there and I pulled one of the girls on top
of the other. Rob was watching me as I gathered up napkins, cups, and paper
towels and piled them on top of the three girls. I sprayed Zippo fluid on top
of girls. I emptied the can of lighter fluid. I had a Zippo lighter with me and
I lit the fire. I heard a whoosh sound of the accelerant when it caught fire.


 I don't remember what I did with the can. I could have threw it on the
pile of stuff in the back of the store. I remembered that my only thought was
to get out. I went outside and remembered that Forest was not in the car
anymore. I had taken a knife from inside the shop. I believe I got it off the
counter. It was a nice knife. I told you all before that I had taken a set of
keys, but it was a knife. I remember now that it was a knife.


 Rob and I were already back in the car when Maurice got there. I asked
Maurice where Forrest was. He said that he must have took off. * * * I think
we were in there about 20 to 25 minutes. I'm not sure. We were in the car,
and on the way out we saw Forrest. He was in the parking lot somewhere, and
we picked him up.


 I remember driving, but I don't remember what direction we went. We
stopped at some bridge. It was about 10 to 15 minutes away from the shop. 
I got out and threw up over the railing of the bridge. I took the knife and threw
it over the rail also. I made sure it was gone. I remember trees and I don't
remember seeing any water. I got back into the car. I don't know what
happened next. I remember being back at the apartment.


 * * * The gun that Maurice had was a black .22 caliber revolver,
small. I think it had wood grips. The gun that Rob had was a small
semiautomatic pistol. It had a clip. I think it was a .38. Some of the writing
on the gun was scratched off.


 Rob and I split up from Maurice and Forrest. Rob and I spent some
time at the apartment. 


 I remember on the weekend that I got into a yellow or gold jeep to see
Mary. Mary is a girl I met at music camp who lives in Helotes, which is near
San Antonio.


 Maurice was driving and I think Forrest was with us. Rob and I rode
with them to San Antonio. We stayed there maybe an hour. I got a hold of
a newspaper, and I remember reading about the fire and the yogurt shop
murders. I read it out loud to everybody. We drove back to Austin.


The balance of the State's evidence was devoted to convincing the jury that this written
confession was sufficiently reliable, because corroborated by other evidence, to justify a
guilty verdict.

The Remainder of the Evidence


 Eliza's mother testified that she was in the yogurt shop sometime between 8:30 and
10:00 p.m. on the night of the murders. During that time, two teenage boys came into the
shop, and one of the boys asked for the location of the bathroom. A second witness, Lucella
Jones, saw two teenage boys in the yogurt shop at approximately 8:15 p.m. Yet a third
witness, Dearl Croft, observed a "young man" in the yogurt shop at about 10:00 p.m. who
asked be allowed to go to the back of the shop to use the restroom. None of these witnesses
specifically identified the appellant as among the teenage boys they had seen. (12) Although
this testimony tended to corroborate the appellant's written statement that he had gone to the
yogurt shop earlier in the evening of December 6th, it conflicts with his claim that it was "still
daylight" at that time. Chandra Morgan, a friend of Pierce's, accompanied Pierce, Welborn,
and two other boys she did not know (but one of whom she identified in court as the
appellant) to the yogurt shop at approximately 10:00 p.m. But according to her testimony,
the two boys she did not know (including the appellant) left the shop through the front door,
not through the back door as the appellant's written statement indicates. Later that night
(presumably after the offense), Morgan ran into the boys again. At this time she saw that one
of the two boys she did not know-she thought it had been the appellant, but she was
uncertain-had the butt of a gun sticking out of his waistband. (13)

 The first arson investigator to analyze the scene, from the Austin Fire Department,
concluded that the fire started on a shelf along a wall in the back room where the bodies were
found. After the appellant's confession in 1999, however, the State sought a second opinion
from a fire expert from the Bureau of Alcohol, Tobacco and Firearms. This second expert,
who never viewed the scene itself, concluded that the fire had actually originated on
styrofoam cups and paper products placed on top of the three stacked bodies in the center of
the room, just as the appellant asserted in his written statement. After reviewing the ATF
agent's report and the crime scene photographs, the local arson investigator changed his
opinion to concur with the ATF agent's conclusion about the origin of the fire. Investigators
found neither any trace of an accelerant nor a can of lighter fluid at the scene. Nevertheless,
they did not rule out that an accelerant had been used. For its part, the defense presented a
crime-scene analyst with substantial experience reconstructing crime scenes involving fire. 
He testified that in his opinion, had an accelerant been used, some trace of it should have
been found. Moreover, in his estimation, the fire began somewhere on the floor, located
within an area that was away from the center of the room in which the bodies had been
stacked. (14)

 Throughout trial there was a controversy with respect to the kind of locking
mechanism on the back doors. The manager of the yogurt shop testified on direct
examination that she was "certain" the back doors were locked with a "thumb latch" on the
inside, and could be unlocked on the outside only with a key. She personally kept a key to
those doors, but could not "recall if anybody else did." On cross-examination it was shown
that in 1998 she had been unable to remember the kind of locking mechanism that was on
the back door, and that she decided it had been a thumb latch only after she viewed a
photograph of the lock after it had been changed sometime after the fire. On re-direct she
revised her testimony to say that to the best of her recall, the back doors had had a "thumb
latch" mechanism. A shift manager similarly testified that she had thought that the back
doors had what she called a "twist lock," and could not recall ever having to get a key to
open them from the inside, but on cross-examination she had to admit that she was not
certain. The defense strove to convince the jury, primarily from photographs of the crime
scene that were apparently dimly lit and indistinct, that there was, in fact, no thumb latch
mechanism, and that, at the time of the offense the back doors could be opened, even from
the inside, only with a key. In the view of the defense, this evidence tends to contradict that
portion of the appellant's written statement in which he admitted that he had first exited, and
then later re-entered, the yogurt shop via the back doors. (15)

 Sarah Adair, a friend of the appellant who also knew Pierce, Welborn, and
Springsteen, was questioned by police about the yogurt shop murders sometime in December
of 1991. The police had questioned her about other of her friends, but afterwards the
appellant approached her to find out whether the police had asked her about him. The
appellant also wanted to know whether the police had inquired about someone who had been
arrested at the mall with a .22 caliber pistol (presumably Pierce). The appellant was
unusually persistent in his inquiries. Afterwards, the appellant talked to Adair's older sister,
Amanda Statham. When Statham asked the appellant why the police had talked to him, "he
told [her] that he had - that he had done it." Afterwards the appellant "[t]ried to laugh it
off." Although the appellant's comment upset Statham, when she told her mother about it,
her mother did not take it seriously, and would not let Statham report it to the police. On an
earlier occasion Statham had overheard the appellant tell Welborn "to keep his fucking
mouth shut."

 After the appellant was arrested, and as he was being booked into jail, a booking
officer routinely asked him whether he had ever contemplated suicide. When the appellant
answered that he had, the officer asked him when. The appellant replied that on December
6, 1991, he had thought about shooting himself.

 The defense presented evidence to suggest that many of the particulars from the
appellant's written statement was information that was publicly known, either from press
releases and newspaper articles or by word of mouth, perhaps originating from the numerous
police officers and firefighters who had responded to the crime scene. For example, it had
been reported back to the police from various outside sources that the perpetrators had
entered through the back door, that one of the girls was shot twice while the others were shot
only once, that one of the three girls had been separated from the others and shot with a
different gun, and that the other three bodies were found with their hands tied behind their
backs and had been "stacked in one pile." The most closely guarded "hold-back" detail that
the police had apparently preserved, however, was the fact that the second weapon that had
been used to kill Amy was a .380 caliber. Except for Springsteen's statement, this one
crucial "hold-back" fact was apparently never reported back to the police. (16) In the months
after the offense occurred, the police obtained at least two statements from individuals who,
both parties now agree, had falsely confessed. The defense argued that, like the appellant's
statement, these false confessions contained both accurate and inaccurate details. Like the
appellant, one of these false confessors asserted that a .38 caliber weapon had been used. 
Moreover, a group of teenagers in the community, known informally as the "People in
Black"(for the dark, "Goth" clothing they wore), was circulating rumors containing both
accurate and inaccurate details about the offense. Appellant was acquainted with some of
the members of this clique. The parties asked the jury to draw competing inferences from
this fact. The defense argued that the appellant obtained the information he gave to the
police during his interrogation from the clique; the State argued that members of the clique
were merely disseminating information they obtained from the appellant.

The Appellant's Interrogation


 On September 9, 1999, the appellant was questioned by the police for approximately
twelve hours, between nine o'clock in the morning and ten-thirty that night. The interview
was interspersed with frequent smoking breaks, and one prolonged interruption while the
detectives took the appellant out to the former site of the yogurt shop. At first, and for
several hours, the appellant denied any involvement in the murders. Eventually he claimed
that, on the drive to San Antonio in the SUV, Pierce had asserted that he knew who had
committed the yogurt shop murders. When the appellant could not tell his interrogators
precisely what Pierce had said, they insisted that he did remember, and described for him a
process they called "revivification," whereby the mind is like a VCR in which memory is
stored, "and you have the ability to bring that stuff back if you think about it hard enough
and you clear your head of all this other stuff." (17)

 A turning point came when, after the detectives repeatedly urged the appellant to
"visualize," (18) they suddenly asked him whose idea it had been to rob the yogurt shop. The
following colloquy ensued:

 Scott: Huh?


 [First Detective]: Whose idea was it to go there?


 Scott: Idea?


 [First Detective]: Here we go again. Getting into that non-responsive
mode of yours. How long do you think you can keep
that up?


 Scott: Wait a minute.


 [First Detective]: You need some time to think real hard, buddy. Because
the next phase . . .


 Scott: Yeah.


 [First Detective]: . . . is coming really quick. Real quick. And your
opportunities are slowly diminishing. But you realize
that, don't you?


 [Second Detective]: Whose idea was it?


 Scott: Maurice's.


 [Second Detective]: Right.


At this point in the process, the appellant admitted knowledge of the murders, but persisted
in claiming he could not remember details.

 At first he insisted he had not gone into the yogurt shop himself, and that Pierce and
Springsteen had gone in through the front door. Asked whether they had carried guns, the
appellant initially asserted that he could not remember, but that Pierce might have. He
eventually described Pierce's gun as a .38 caliber revolver. When the detectives asked him
if a second gun had been used, the appellant first could not remember whether Springsteen
had had a gun. Later he said that he had seen the handle of a pistol in Springsteen's 
waistband. He volunteered that it had had a wood or "wood facsimile" handle, but when
they inquired whether he knew what an automatic looked like, he suddenly changed his story
and claimed it had been, in fact, an automatic. (19) He could not tell them the caliber of this
second gun, and soon after stated that he was not really positive Springsteen had had a gun
at all. (20)

 When one of the detectives asked whether they had "cased" the yogurt shop, the
appellant acknowledged that they had. First he said they had noticed that the back door of
the yogurt shop had been "propped open," but he later abandoned this assertion. (21) The
appellant continued to insist he had not gone in, even though the detectives accused him of
"minimizing" his involvement, to his eventual detriment. (22) He even alluded at one point to
the fact that "we" came back out of the shop and drove off, but immediately insisted he had
misspoken. When the appellant offered no additional details, the detectives threatened to
"just take him to the Grand Jury and - he don't want to talk about it no more." The appellant
broke down crying, but insisted, "I can't remember." The following soon occurred:

 Scott: . . . I . . . I don't remember going inside the-


 [Detective]: Michael, Michael.


 Scott: Are you telling me I went inside?


 [Detective]: I know you went inside. Let's finish this today. You went
inside there with Maurice and Robert. And you know you did. 
You've been doing great up until now. These things are coming
back. But you know you went inside there with them.


 * * *


 Scott: I don't remember going inside.


 [Detective]: Come on, Michael. You went inside. Earlier you said, "We ran
back out to the car." Meaning you, Maurice, and Robert. You
said, "we." Well, "we" did. Michael, you went with them
inside that store.


 Scott: Okay.


The detectives falsely assured the appellant that they knew "all about" "those two guns." 
They told him that they did not believe he had shot the girls. The appellant asked, "Look,
can I tell you all what I keep seeing in my head? * * * I keep seeing these girls get shot." 
He followed this almost immediately with the disclaimer: "I don't know if this is real or not
or if this is-," at which point one of the detectives interrupted him to assure him, "Michael,
it's real." Even as the appellant began to describe events inside the yogurt shop, he
continued periodically to claim, e.g., "I don't honestly remember going in the building."

 According to the appellant's initial version of these events, when they first entered the
yogurt shop, one of the girls (he could not say which but remembered that she was wearing
a uniform) screamed and ran toward the front. Springsteen grabbed her and "spun her
around." (23) Pierce then brought all four of the girls to the cash register and demanded to
know "where the rest of the money was." Without prompting, the appellant informed the
detectives that one of the girls told Pierce, "There isn't anymore. They've already made their
drop." Pierce then shot two of the girls there behind the counter. (24) The detectives
immediately began to inquire, "Did they do anything else to these girls?" They assured the
appellant that they already knew what had happened to the girls and "[w]hat they were
wearing[.]" The appellant could not remember.

 After a break, the appellant remembered the girls had been tied up, but could not
remember with what. He thought they were wearing their uniforms when they were tied up. 
The detectives immediately accused him of "starting to go off in this other tangent and
bullshit with us again." The appellant replied, "I can't even remember going inside the place,
guys. I don't remember walking through the doors." Pressed, the appellant first said that the
girls had been tied with an extension cord. Then he said it was a napkin, or "something
white." Finally he told the detectives:

 Scott: A T-shirt. And I want to say electrical cord.


 [Detective]: No. Think harder. A T-shirt and something else.


 Scott: Um-


 [Detective]: I'm not going to tell you. Because you know. I want to hear it
from you.


 Scott: I . . . I'm trying to remember, guys.


 [Detective]: Something else.


 Scott: It was a T-shirt and something else.


 [Detective] And you helped Rob tie them up?


 Scott: I think - I guess I did. (25)


 [Detective]: Yeah. You did. What were the girls wearing by the time they
were tied up? What were they wearing? Michael, that's a
gimme. That's an easy one.


 Scott: Not a whole lot.


 [Detective]: Not a whole lot.


 Scott: Used their own clothes to tie them up.


 [Detective]: Used their own clothes to tie them up. You and Rob. And by
the time you were done, what were they wearing? Say it.


 Scott: Nothing.


 Next the detectives suggested to the appellant that Pierce and Springsteen had made
him do "something else" to the girls. The appellant first asserted that they had made him
"start kicking them." Told that "that ain't it," he next asked, "I didn't choke one of them, did
I?" When this did not satisfy the detectives either, the appellant said, "I don't think I raped
them. That's not me. Was one of them raped?" To this query, the detectives responded by
asking the appellant whether one or two of the girls were in fact raped. The appellant
responded: "I think one of them got raped." Perhaps thinking of the metal scoop, the
detectives next began pressuring the appellant to tell them "how" the one girl was raped. But
at no point during the remainder of the interrogation process did the appellant ever mention
the metal scoop.

 Under renewed pressure to tell the detectives what he had been made to do, the
appellant reported, first that he had been forced to garrote one of the girls, then that he had
been forced to bludgeon them. Finally, the appellant observed, "I had a pocket knife on me." 
The detective interjected: "That's four. Kicking, strangling, bludgeoning, knifing. No." At
this juncture the appellant asked:

 Scott: They didn't make me shoot them, did they?


 [Detective]: Well, did they? Tell us. I want to hear it. Did they? Did either
Maurice or Robert make you shoot those two girls? Or both of them? Say it,
Michael? Is that what happened?


 Scott: I think so.


 [Detective]: You think so?


 Scott: I think so.


Asked with what gun, the appellant asserted that he had used Pierce's revolver. (26) First he
claimed to have shot one girl in the back of the head and the other in the temple. But soon
after, at the prompting of one of the detectives, he changed again, acknowledging that he had
shot both girls in the back of the head.

 Next, the detectives wanted to know whether Springsteen had shot anyone with the
semiautomatic pistol. The appellant indicated that Springsteen had shot one of the two girls
whom he had earlier claimed were shot behind the counter. One of the detectives then asked,
"So one of the girls, you're saying, was shot twice?" This is the first mention by anyone that
one of the girls may have been shot a second time with a different gun. The appellant said,
"no." But at the detectives' suggestion they immediately took another break, during which
the appellant had a "flashback," suddenly remembering that Springsteen "may have shot one
of the other girls again because she was still alive." Even after this apparent epiphany, the
appellant continued to claim that all four girls had been shot "behind the counter." (27) Without
further prompting, he told the detectives he thought he had heard "a total of five shots. But
I'm not positive."

 The detectives shifted gears to talk about the fire. The appellant claimed that Pierce
had started it by piling up styrofoam cups and napkins "[c]lose to the girls." Later he
volunteered that Pierce may have piled the stuff on top of the girls, but at this point he still
maintained that they had all been shot behind the counter in the front part of the store. Pierce
then set the fire with a Zippo lighter. Almost immediately the appellant changed his story,
however, telling the detectives he did not see who set the fire.

 At the appellant's request, the detectives took him out to the scene where the yogurt
shop had been. What occurred there went unrecorded, but by the time they returned to the
interrogation room, the appellant had reported certain additional memories. (28) He
remembered for the first time that he and Springsteen had gone into the yogurt shop earlier
in the evening and exited the back door. He also remembered seeing keys in the front door. (29) 
For the first time, he clearly asserted that the girls were all taken to the back of the shop. At
this point the appellant helped tie their hands and feet. (30) Pierce shot the first two girls in the
back of the store, and then the appellant was made to shoot Amy, but he did not kill her. As
he headed out the back door, the appellant heard two more gunshots. The appellant
acknowledged in response to a leading question that the last shot he heard had sounded
different from the others.

 The next morning, on September 10, 1999, the appellant initially denied that he had
ever gone into the yogurt shop other than to step into the back door after he heard the
gunshots. Even so, he claimed to remember having seen the keys in the front door, and
looking out the front window of the shop. The detective then assured the appellant that they
had no doubt he was in the yogurt shop, and that he "pulled the trigger" while there. The
appellant soon acknowledged that he "probably shot one of them. I made a guess yesterday
of who it was. But I'm not sure." The detective then used a visualization technique to try
to enhance the appellant's memory, but, although for the first time he tentatively suggested
he might have been the one to set the fire, he still claimed not to be able to remember having
shot any of the girls. The detective began to accuse the appellant of having shot all four of
the girls. The appellant responded, "I can't remember shooting anybody. You all are telling
me that I did." A short time later he told the detective, "I was telling you all what you all
wanted to hear." He broke down crying, and they took a break.

 After the break the appellant again acknowledged that he had fired the gun once, and
that he had set the fire. "I remember a can of Zippo fluid." The detectives pressured the
appellant to tell them where he had set the fire, to which he replied, "I . . . I piled it up on top
of them?" "Michael, don't ask me," one of the detectives told him. A short time later,
weeping, the appellant affirmed, "I set them on fire." "Yes, Michael," the same detective
assured him. Even so, a short time later, when asked how close the pile was to the girls, the
appellant replied, "I don't remember yet. I will remember." He thought he threw the empty
Zippo can onto the pile and then set the fire. He could not remember where.

 Asked what else had happened to the girls before the fire was set, the appellant
admitted, "They made me rape one of them." He could not remember which one. (31) He
seemed puzzled when a detective asked, "What did you rape her with?" (32) With some
prompting, he said the girls were no longer screaming because they were gagged. The
detectives assured him he could remember what they were gagged with, but he could not,
other than to say that it had been white. (33) Then, in an apparent attempt to get the appellant
to admit that Amy had been left in another part of the room, not on the pile with the other
girls, the detectives asked:

 [First Detective]: Now you told us that one of the girls had run earlier. 
Right?


 Scott: I don't remember.


 [First Detective]: It's okay. Hold on just a second. Who . . . who, if
anybody, raped her? And I'm not saying that she was,
I'm just asking. Did anybody-


 Scott: I don't think so. No.



 [Second Detective]: Where was she at?


 [First Detective]: Whenever you were squirting lighter fluid on these girls,
where was that girl at?


 Scott: I'm not sure. I'm not sure. I don't- I'm not sure.


When the detectives continued to press him to tell them how the bodies had been arranged,
the appellant answered that Pierce had instructed him "to pile them up and burn them." At
the end of the interview he remembered that it had been Springsteen, not Pierce, who had
handed him the gun, and, for the first time, he claimed to have been the last one to leave the
yogurt shop after setting the bodies on fire.

 On September 13, 1999, the police interviewed the appellant for the last time before
he gave them his written statement the next day. In that last interview, which was relatively
brief, he remembered seeing Pierce with one of the girls in a separate room he thought might
have been an office. He also thought that he had gagged one of the girls with paper towels
or napkins. Finally, he again recalled that the gun he had shot the girl with had come from
Springsteen rather than Pierce, and that it was a .22 caliber. Under persistent questioning,
he failed to remember with any certainty the caliber of the second gun, but thought it had
been a semiautomatic .38 caliber.

Springsteen's Statement


 On September 15, 1999, several of the investigating detectives interviewed Robert
Springsteen for five and a half hours in Charleston, West Virginia. One of the detectives
summarized what Springsteen told them during the course of the interview, (34) thus:

 Q. All right. Did Mr. Springsteen admit participation in the yogurt shop
murders to you?


 A. Yes, sir.


 Q. All right. Can you tell me what he told you with regard to that topic.


 A. He said as we talked to him - he originally said that he did not know about
the murders, did not even know they had occurred until he had been
interviewed by the police.


 As the interview continued, he remembered he bought a newspaper and
read it in a stolen Pathfinder on the way to San Antonio. During the interview,
Robert Springsteen admitted involvement in the murders by telling us that he
went into the yogurt shop prior to the robbery and opened the back door so he
had a way to get in.


 Robert Springsteen said he went through the front door, then went to
the bathroom. Robert Springsteen said when no one was looking he unlocked
and opened the back door. Robert Springsteen said he propped it open by
using a folded pack of cigarettes or a rock to keep the door from shutting all
the way, saying it wasn't noticeable unless you were looking right at it. 
Robert Springsteen said at some point in time he went back that evening. He
said he went through the back door.


 Robert Springsteen said there was a silver .380 automatic handgun used
in the yogurt shop. Robert Springsteen said he raped a girl; stated he did not
think he ejaculated. He said he shot a girl in the back of the head with the .380
as she was crawling, screaming, and crying. He demonstrated the position that
Amy Ayers died, which was the position we found her in after the fire was
extinguished.


 Robert Springsteen talked about hearing a total of five shots, maybe six,
but remembered five. And after the robbery, Robert Springsteen said he left
the yogurt shop, went to a bridge where he got out of the car and threw up. 
Then he ended the interview before we were complete.


The detective also showed the jury a still image from the video of Springsteen's 
interrogation. In that still image Springsteen demonstrated the position of Amy's body on
the floor as they had left it. The State invited the jury to compare the similarities between
this still image and photographs of Amy's body as it had been found at the scene. The
detective assured the jury that Springsteen's interrogators did not prompt him to say that he
had left the back door of the yogurt shop open so that he could later get back in that way. 
Nor did they suggest to him that he should say that the second gun used in the offense was
a .380 caliber, that they had read a newspaper on the drive to San Antonio, or that he had
vomited at the bridge after the offense.

The Final Argument


 Given the length and complexity of the trial, the trial court allotted each side several
hours for final argument. Very early on, the first prosecutor to argue alluded to 1) the fact
that Springsteen was aware of Amy's position when she was killed, 2) Springsteen's
assertion that the killers had come in through the back door, and 3) Springsteen's explanation
that he had propped the door open with a cigarette pack or a rock. Later, after the defense
had concluded its final argument, the State addressed the issue of the false confessions. The
second prosecutor contrasted the appellant's confession by explicitly pointing out that
Springsteen had corroborated it, whereas the individuals whom the false confessions had
implicated as participants had flatly denied any complicity and had provided alibis. (35)

 The prosecution saved the bulk of its argument with respect to Springsteen's statement
until the very last. Just before the jurors retired to deliberate, they heard the lead prosecutor
make the following argument:

 So Michael Scott gives his confession to police and as [one of the
investigating officers] says, we still have homework to do. So they go to West
Virginia and they talk to Robert Springsteen who has not been in Austin since
1992, early part of 1992. And the tactics that were employed - sitting in his
room silently for 10 or 12 minutes waiting for him to decide to confess. That's
the tactics you heard about, among others obviously.


 Michael Scott's written statement about the newspaper in the Pathfinder
- I'll let you read that when you get back in the jury room. But he talks about
it. Robert Springsteen's interview. Robert Springsteen remembered he bought
a newspaper and read it in a stolen Pathfinder on the way to San Antonio.


 We got to go back through the questions that led to this response. They
just asked him: Do you remember a Pathfinder? He said, we went to San
Antonio and as a matter of fact bought a newspaper on the way down. Bought
it Sunday morning before 6 a.m. That came from Robert Springsteen without
being fed information by the police. It's in the record.


 THE COURT: Ten minutes


 MR. SMITH: Thank you. I'm running out of time, so you know what
Michael Scott says about the restroom, how they went in, opened up the back
door, left it ajar so they could come back. Robert Springsteen in West
Virginia, a completely different state, who hasn't been talked to by the police
en route to the police department, whose entire confession up there is on
videotape, says that they went into the yogurt shop prior to the robbery,
opened up the back door so they had a way to get in.


 The question that elicited that response was [another detective]saying:
You just remembered. I saw your head move. Tell me about it.


 Answer by Mr. Springsteen: At some point in time, came through the
back door, opened up the back door. Says he went through the front door,
went to the bathroom. When no one was looking, he unlocked it and opened
the back door, used a folded pack of cigarettes or rock to keep the door from
shutting all the way.


 Michael Scott's written statement talks about coming back in through
the back door. Robert Springsteen, same thing in West Virginia the next day. 
So at some in [sic] point in time he went back that evening, came in through
the back door.


 Michael Scott's written statement about sexual assault. Robert
Springsteen's interview - that's okay. We can just leave that one right there.


 Robert Springsteen's interview. Michael Scott described that gun as a
James Bond gun, a small semiautomatic. And you saw one here in court. Very
small, equivalent of a nine millimeter, will fit in the palm of you hand. 
Michael Scott calls it a James bond gun. Robert Springsteen said it's a silver
.380. That information was a closely guarded fact in this investigation. 
Robert Springsteen knows the answer to that question.


 Said Amy was shot or he described the person he shot as she was
crawling, screaming and crying. Are you going to tell me based on all that
information in the corner over there by the office wall that anybody can say
that she didn't flop around and she never crawled? 


 Michael Scott's statement about going to a bridge and throwing up. 
Robert Springsteen, same thing in West Virginia. The questions that elicited
this response from Robert Springsteen were: Where did you drive to? He said,
thank you, thank you. There is a bridge, a little stream over there by the
yogurt shop. What did you do? He mentions that he threw up. These facts are
not suggested to him. That, ladies and gentlemen of the jury, right there is a
neutral fact. A neutral fact that only these two people know.


 As you wade through the evidence, I have some objective facts for you. 
I have some objective facts for you. Michael Scott describing the body
positions, two girls like this. One girl laying on top. Robert Springsteen
talking about the girl that he killed. Those are objective facts. That's
information right there, ladies and gentlemen, that only the people who
committed this offense could know.


 Stay in there as long as you have to. If somebody decides that they
have a problem with this case, you get them to explain these two pieces of
information, and that piece of information in the middle where they both know
about going to a bridge and throwing up.


In essence, the prosecutor thus invited the jurors to resolve any doubt they might otherwise
have about the reliability of the appellant's confession by considering how closely it
corresponded to Springsteen's, both in the details of the offense itself, and in other, "neutral"
aspects. He also urged the jury to consider that, unlike with the appellant, the interrogating
officers had not suggested answers to Springsteen. The jury deliberated from 3:34 p.m. on
a Friday until 3:15 p.m. the following Sunday before reaching a guilty verdict.

On Appeal


 On appeal the appellant challenged the legal and factual sufficiency of the evidence,
an issue that is not presently before us. In the context of rejecting these points of error, the
court of appeals recognized that the State's case against the appellant was predicated on his
own statements to the police, since there was no forensic evidence tying the appellant to the
offense independent of his statement. The court of appeals acknowledged that there were
components of the appellant's statements that did not match up to the crime scene. 
Nevertheless, the court observed that many of the details of the appellant's account do
coincide with the known facts, and held that a rational jury could have found him guilty
beyond a reasonable doubt, and that the appellant's jury having found him guilty did not
amount to a manifest injustice on the facts of this case. (36)

 When it later came to consider whether the admission of Springsteen's statement
might have contributed to the jury's guilty verdict, the court of appeals seems to have
discounted the potential problems with the appellant's statement that might have caused a
rational jury to doubt its reliability. (37) The court of appeals conceded that Springsteen's
paraphrased statement was "admitted to corroborate [the appellant's] statements and thus to
rebut [the appellant's] defensive claim that his statements were unreliable and untrue." (38) The
court of appeals nevertheless identified three circumstances that it believed converged to
supply the jury, quite apart from Springsteen's statement, with "overwhelming support [for]
a finding that [the appellant's] statements are true." (39)

 First, the court of appeals cited the many details in the appellant's statements that
corresponded to the physical evidence at the scene. (40) Second, the court of appeals stressed
that it was not until the appellant informed investigators where the fire originated that they
realized that their original expert's assessment of the fire's origin was wrong. (41) Third, the
court of appeals pointed to other evidence that independently corroborated aspects of the
appellant's statements. (42) The court of appeals acknowledged that the prosecutor argued to
the jury at some length about the interlocking nature of the appellant's and Springsteen's
statements. But the court of appeals discounted the significance of this argument because
the State had spent the great majority of its argument emphasizing the other facts that
matched the appellant's version of the murders. (43) In the analysis that follows, we will
address each of these considerations in turn.

THE LAW


 In determining specifically whether constitutional error under Crawford may be
declared harmless beyond a reasonable doubt, we recently observed that the following
factors are relevant: 1) how important was the out-of-court statement to the State's case; 2)
whether the out-of-court statement was cumulative of other evidence; 3) the presence or
absence of evidence corroborating or contradicting the out-of-court statement on material
points; and 4) the overall strength of the prosecution's case. (44) As the court of appeals rightly
noted, the emphasis of a harm analysis pursuant to Rule 44.2(a) should not be on "the
propriety of the outcome of the trial." (45) That is to say, the question for the reviewing court
is not whether the jury verdict was supported by the evidence. Instead, the question is the
likelihood that the constitutional error was actually a contributing factor in the jury's
deliberations in arriving at that verdict-whether, in other words, the error adversely affected
"the integrity of the process leading to the conviction." (46) In reaching that decision, the
reviewing court may also consider, in addition to the factors listed above, inter alia, the
source and nature of the error, to what extent, if any, it was emphasized by the State, and
how weighty the jury may have found the erroneously admitted evidence to be compared to
the balance of the evidence with respect to the element or defensive issue to which it is
relevant. (47) With these considerations in mind, the reviewing court must ask itself whether
there is a reasonable possibility that the Crawford error moved the jury from a state of non-persuasion to one of persuasion on a particular issue. (48) Ultimately, after considering these
various factors, the reviewing court must be able to declare itself satisfied, to a level of
confidence beyond a reasonable doubt, "that the error did not contribute to the conviction"
before it can affirm it. (49) After our own review of the record, we are unable to achieve that
level of confidence that Springsteen's statement did not contribute to the appellant's
conviction.

APPLICATION OF THE LAW TO THE FACTS


Appellant's Statement Matches the Physical Evidence


 The court of appeals initially focused on assertions in the appellant's oral and written
statements that corroborated the physical evidence. We will examine the corroborative value
of those assertions more or less in the order that the court of appeals listed them:


 The appellant knew that the front doors were locked and that a key had
been left in the lock.



This fact was known to some of the responding firemen, and defensive evidence suggested
to the jury that some information known to the firemen may have been disseminated to the
public. It is also notable that the appellant did not mention that it was a single key that had
been left in the door until he gave his written statement.

 

 He knew that the killers had entered through the back door, which had
been left open.



One of the recurring issues during the course of trial was the nature of the locking
mechanism on the back door. If, as the defense contended, at the time of the offense the
back door could be opened only with a key, then the appellant's account that he and
Springsteen had left the back door open so that they could reenter later to perpetrate the
crime would likely be false, not corroborative. It is difficult to tell from a cold record how
plausible this theory might have been. But it is certain that Springsteen's statement,
containing a similar account, was highly damaging to this defensive posture.

 

 He knew that the money had been "dropped."


In describing what one of the girls had told Pierce with respect to handling the day's receipts,
the appellant seemed to know without prompting the specific terminology-"dropped"- that
employees of the yogurt shop used. The day-shift receipts had already been "dropped" in
the floor safe at the time of the offense, but not the night-shift receipts.

 

 He knew that one of the girls had been slapped, a fact confirmed by
evidence that Amy had an abrasion on her lip.



The forensic pathologist testified that Amy had a lip contusion that was consistent with
sustaining a blow or a fall. At one point, while describing one of the girls telling Pierce that
the money had already been dropped, the appellant, obviously "visualizing" again, asserted:
"I hear somebody get slapped." He could not remember who did the slapping or who got
slapped, but the context in which he purports to remember it suggests it was Pierce slapping
Eliza or Jennifer, one of the employees, rather than Amy. Later he told the detectives that
Springsteen had slapped one of the girls whom he had "spun around" at the beginning of the
offense. He did not remember which girl this was, but since he described her as wearing a
uniform, it is unlikely it could have been Amy. Still later he revised his story to say that it
had happened toward the end of the incident. When they revisited the slapping incident one
more time, with photographs of all of the girls displayed, the appellant manifested confusion
as to which girl had been slapped. On the second day of interrogation he once again asserted
that the incident happened early rather than late, and that Pierce rather than Springsteen had
done the slapping. In short, his account of the slapping incident was tentative, vague, and
vacillating. At times he seemed to doubt it had happened at all. He left it out of his written
statement altogether.

 

 He knew the type of weapons used.



Throughout the early part of the interview process, the appellant maintained that Pierce had
carried a .38 caliber revolver. Later he expressed some uncertainty whether it had been a .38
caliber or a .22 caliber, and he was encouraged by the police to believe it had been the
latter. (50) He later came to assert that the semiautomatic that Springsteen had carried was the
.38 caliber. The most closely guarded "hold-back" fact, that the second weapon had actually
been a .380 caliber, was a detail the appellant apparently did not know. The fact that
Springsteen revealed this detail to the police with relatively little prompting was very
incriminating to the appellant.

 

 He knew that Amy was still alive after he shot her, and he knew the
number of shots that were fired.



It was the detectives who first suggested to the appellant that "one of the girls . . . was shot
twice." Only after this suggestion did the appellant first remember that Springsteen shot one
of the girls a second time. It would not have been difficult at that point for him to calculate
that he must have heard a total of five shots.

 It might also be added to the court of appeals's list that the appellant asserted that the
girls had been tied with articles of their own clothing. But at first the appellant was at a
complete loss to tell the detectives what the girls had been tied with, and his most persistent
assertion was that it had been an electrical cord. Only after one of the detectives alluded to
what the girls were wearing (intimating that they were wearing nothing at all) did the
appellant assert that they had been stripped naked and bound with their own clothing. 
Indeed, very few of the corroborative details cited by the court of appeals are immune to the
appellant's criticism that they were either suggested to the appellant to varying degrees by
the interrogating officers, or were already available to some portion of the public at large as
indicated by the accurate details supplied by some of the known false confessors.

 Moreover, like others who gave known false confessions to the police, the appellant
supplied many details that either conflict with, or at least are not corroborative of, the known
physical evidence. For example, according to the appellant's persistent account, Pierce was
trying to get the first two girls that were shot (presumably the employees, Eliza and Jennifer)
to tell him where the money was right up to the point that he shot them. But Eliza was found
with a gag over her mouth, which would have made it difficult for her to talk, and Jennifer
also had a gag, albeit one that had slipped down around her neck by the time she was
discovered. For most of the appellant's interrogation he insisted that all four girls had been
shot behind the counter in the front of the store, but there was no physical evidence that any
of the girls were shot there. The appellant claimed to have helped tie the girls' hands and
feet, though no evidence indicates their feet were tied. He did not know that the girls had
been gagged with socks. Investigators found neither an empty can of Zippo lighter fluid, nor
any vestige of an accelerant at the scene. The appellant claimed that Pierce had taken one
of the girls into the office, but it was uncontested that the office remained locked for the
duration of the offense. He also claimed that the girl in the office still had a shirt on, though
all four girls were found nude. He claimed at various times that he shot one of the girls in
the temple or in the face, though none of the girls was shot in these places. Finally, despite
repeated efforts on the part of his interrogators to get him to do so, the appellant never
offered any mention of the metal scoop.

Point of Origin of the Fire


 The court of appeals placed greatest emphasis upon the fact that it was not until the
appellant's interrogation that the fire investigators realized that the fire had actually been set
on top of the girls' stacked-up bodies, rather than on a shelf as they had originally thought. 
The court of appeals characterized this as the "most critical corroborating fact," and placed
great weight upon it in its harm analysis. (51) However, the court of appeals failed to consider
the fact that whether the fire had actually been set as the appellant eventually described
during his interrogation, and then repeated in his written statement, was perhaps the most
hotly contested issue of the trial. A jury that believed the State's expert testimony as to the
origin of the fire would indeed have found the appellant's account highly corroborative. But
the State's own local expert had not originally thought the fire had started as the appellant
later described, and the appellant's crime scene reconstruction expert expressed the opinion
in the presence of the jury that the fire had not started either on a shelf, as originally
believed, or on the bodies of the girls, as the appellant claimed and the State's re-evaluation
confirmed, but at a third location altogether. These circumstances might have led the jury
to doubt the corroborative value of the appellant's account with respect to the fire's origin,
had the appellant's version of the events not been otherwise corroborated by Springsteen's
confession.

Other Corroborating Evidence


 Although Chandra Morgan corroborated the appellant's claim that he and the others
had cased the yogurt shop before the offense, her testimony was impeached, and none of the
other witnesses who were in the yogurt shop that evening could positively identify the
appellant. Only one of the suspicious statements the appellant made to friends shortly after
the offense was directly incriminating, and the witness's mother did not take that admission
seriously enough at the time to notify the police. During final argument, one of the
prosecutors emphasized the appellant's book-in statement that he had contemplated shooting
himself on December 6, 1991, the night of the offense. She pointed out that for the appellant
to have admitted considering suicide on the very night of the offense implicated him in the
offense quite apart from any statement he had given to the police during the interview
process. The jury would have been more than justified in viewing the evidence this way. 
But the jury might also reasonably have discounted this evidence as nothing more than
confabulation on the appellant's part-another unreliable by-product of "revivification" and
"visualizing," the faulty memory-enhancing techniques used by the police, had Springsteen's
confession not corroborated the appellant's inculpatory statements.

 In short, though there was a fair amount of evidence independently corroborating the
appellant's account, almost none of it went unchallenged or unimpeached in one respect or
another by the defense. We do not think the court of appeals was justified in characterizing
the corroborating evidence as "overwhelmingly support[ing] a finding that Scott's statements
are true." (52) We do not mean to suggest by this that the jury could not rationally have
convicted the appellant even absent Springsteen's statement-quite the contrary. But a
constitutional harm analysis does not turn on whether, discounting the erroneously admitted
evidence, the remaining evidence was legally sufficient to convict. (53) Instead the question is
whether, given the state of the record as a whole, the reviewing court can say, to a level of
confidence beyond a reasonable doubt that the erroneously admitted evidence did not
contribute to the jury's verdict. (54) Especially in view of the prosecutors' final arguments, we
cannot say beyond a reasonable doubt that Springsteen's statement did not contribute to the
jury's verdict.

The Prosecutor's Final Argument


 The court of appeals quoted verbatim the same portion of the prosecutor's final
argument that we have set out earlier in this opinion. (55) The only comment the court of
appeals made about the significance of that argument, however, was to say that it took up
only four out of seventy-seven pages of the State's argument in the reporter's record. This
bare observation failed to take into account the fact that practically the entire jury argument
constituted an intensive debate between the parties whether the appellant's written and oral
accounts of the offense were sufficiently corroborated by the physical evidence and other
witnesses that the jury should deem them reliable. Each side highlighted the evidence in the
record that it believed supported its position with respect to critical issues such as the locking
mechanism on the back door and the origin of the fire. They argued pro and con the
reliability of the witnesses who provided independent corroboration, and the significance of
the false confessions. They debated the suggestibility, vel non, of the detectives's
interrogation techniques. Along the way the prosecutors mentioned Springsteen's statement
several times, as we have summarized already.

 To punctuate its argument, the State emphasized the importance of Springsteen's
statement to its case. The lead prosecutor pointedly reminded the jury that both the appellant
and Springsteen had independently provided to police information about throwing up over
a bridge after the offense, and reading a newspaper account in the stolen SUV the next day. 
He urged the jury to accept the veracity of the appellant's statement with regard to the back
door of the yogurt shop because Springsteen, without prompting, said the "same thing in
West Virginia the next day." He emphasized that Springsteen could accurately describe the
posture in which they had left Amy's body. And perhaps mostly importantly, he reiterated
that Springsteen knew the most closely guarded "hold-back" fact, that the second gun used
to kill Amy had been a .380 caliber weapon. He invited the jury to take its time deliberating,
but to resolve whatever doubt it might have about the reliability of the appellant's statements
by comparing them to Springsteen's. We cannot say to a level of confidence beyond a
reasonable doubt that the jury did not do just that during its two days of deliberations. (56) We
hold that the court of appeals erred in failing to conclude that there is at least a reasonable
possibility that the erroneous admission of Springsteen's statement moved the jury from a
state of non-persuasion to a state of persuasion with respect to the reliability of the
appellant's inculpatory statements, and thus contributed to its verdict.

CONCLUSION


 For the reasons stated above we reverse the judgment of the court of appeals, reverse
the appellant's conviction, and remand him to the custody of the Travis County Sheriff to
answer to the indictment.

Delivered: June 6, 2007

Published
1. 453 U.S. 551 (2005).
2. See Tex. Code Crim. Proc. art. 37.071, §§ 2(b)(1) & (g). The appellant's jury found that
there was not a probability that the appellant would commit criminal acts of violence that would
constitute a continuing threat to society.
3. 541 U.S. 36 (2004).
4. Scott v. State, 165 S.W.3d 27, 45-51 (Tex. App.--Austin 2005). Chief Justice Law
dissented, declaring himself unable to conclude that the error was harmless beyond a reasonable
doubt. Id. at 60-63.
5. See Tex. R. App. Proc. Rule 44.2(a) ("Constitutional Error. If the appellate record in a
criminal case reveals constitutional error that is subject to harmless error review, the court of appeals
must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable
doubt that the error did not contribute to the conviction or punishment.").
6. Because Springsteen was sentenced to death, his appeal was taken directly to this Court,
notwithstanding that the Governor later commuted his death sentence. See Tex. Code Crim. Proc.
art. 37.071, § 2(h).
7. Springsteen v. State, (Tex. Crim. App., No AP-74,223, delivered May 24, 2006) (2006 Tex.
Crim. App. LEXIS 2340, *14-*25), cert. denied, ___ U.S. ___, 127 S.Ct. 1382 (2007 U.S. LEXIS
2690, February 26, 2007).
8. During final arguments, one of the prosecutors commented, "This has been a long trial. I
think to date it has been the longest trial ever tried in this county." We do not know whether this is
an accurate observation. But no summary of the evidence is likely to completely do justice to the
length and complexity of the trial.
9. The appellant was indicted and convicted for the offense of the capital murder of Amy Ayers
by shooting her or strangling her in the course of a robbery or burglary. The jury was authorized to
convict him either as a primary actor or as a party to the offense.
10. The ligature around Jennifer's neck may have been a gag that had fallen away from her
mouth. There was no evidence suggesting she had been strangled. By contrast, Amy had been
strangled, but she was still alive when she suffered the gunshot wounds.
11. The record variously identifies this as a metal scoop and an ice scoop. The court of appeals
called it an "ice cream scoop." Scott v. State, supra, at 33. The forensic pathologist found vaginal
abrasions that were consistent with Sarah having been sexually assaulted with the handle of this metal
scoop.
12. Jones "tentatively" identified Pierce as one of the teenage boys she had seen.
13. The defense impeached Morgan's testimony with evidence that she had a reputation for
untruthfulness. Moreover, when the police interviewed Morgan in 1998, she told them nothing about
having been to the yogurt shop the night of the offense. Morgan's credibility was debated by the
parties during their final arguments.
14. The court of appeals observed that "Scott's trial counsel spent hours cross-examining the
State's arson experts in an effort to discredit their testimony. The defense did not, however, proffer
any contradictory expert testimony." 165 S.W.3d at 40. The latter observation is simply mistaken. 
The defense did present a qualified expert to contradict the State's arson experts, as summarized in
the text. Even the State during its final argument mentioned the appellant's expert by name as one
of the "three fire experts in this case." The State was sufficiently worried about the impact of the
appellant's expert that prosecutors devoted some considerable effort during their final arguments to
persuade the jury that it should find the State's experts more reliable. 
15. Both sides featured this issue relatively prominently in their final arguments.
16. It was suggested out of the presence of the jury that, at one point, several suspects from
Mexico were aware that a .380 caliber weapon had been used during the offense, but the trial court
declined to admit any evidence of this fact, out of concern that the defensive evidence was already
straying too far afield. To compensate, the trial court ordered the State not to allude to the fact,
during its final argument, that only Springsteen's statement mentions this crucial "hold-back" fact. 
Despite the trial court's ruling, the prosecutor made two such allusions toward the conclusion of his
final argument. First he argued: "The caliber of that semiautomatic was a closely guarded fact in this
investigation, something that Mr. Springsteen knows." When the appellant objected that this
mischaracterized the evidence, the trial court merely instructed the jury to take the evidence from the
witness stand, not from the attorneys. Since the evidence showed that Springsteen apparently did
know the precise caliber of the second weapon, there is no reason to believe that the jury would not
have credited the prosecutor's comment. Later, at the end of his argument, the prosecutor returned
to this theme, again without objection: "Robert Springsteen said it's a silver .380. That information
was a closely guarded fact in this investigation. Robert Springsteen knows the answer to that
question."
17. The defense presented a forensic psychologist who was an expert on memory who told the
jury that this is not, in fact, how the process of memory works at all, and that to suggest such a thing
during an interrogation is as likely to trigger false as it is accurate recall. He also testified that, while
revivification is an acceptable therapeutic technique, it is not a reliable forensic tool, and can even
create false memories.
18. The defense expert contended that this tactic was just as likely to evoke false memory as true
memory.
19. During the course of the appellant's interviews, he frequently complained to the detectives
that he did not know whether what he was telling them constituted accurate memory or just his best
guess as to what they wanted him to say.
20. The next morning when the interrogation continued, the appellant claimed to remember that
Springsteen had shown him a .38 caliber automatic with a round handle.
21. One of the detectives immediately asked, "All the way open?" The appellant replied, "All
the way open. And that's what decided it. They would go in the front. We would meet them out
back with the car." Later the appellant changed his story, insisting the door was open, but "[n]ot real
far." "I thought it was propped all the way open. But that doesn't make sense." He could not
remember what it was propped open with, or even if it was propped open at all.
22. "Michael, do you see what you are doing? You're still minimizing your involvement in this
thing. Why are you doing that? It's just going to fuck you."
23. Later in the day the appellant would place this event more toward the end of the incident, and
he would assert that Springsteen also slapped the girl. He still could not say which girl it was.
24. None of the girls was found behind the counter, nor did the forensic evidence suggest that
any of them had been shot there.
25. Heretofore, the appellant had not volunteered that he had helped to tie the girls up. Instead,
just before this colloquy, the detective had observed that Springsteen would not have been able to
tie them up by himself. The appellant had responded, "I don't remember if I helped him or not." 
Asked then whether he "might have," the appellant had replied, "I guess I did."
26. Presumably he meant the .38 caliber revolver he had earlier told the detectives that Pierce had
taken into the yogurt shop. Later, the appellant would describe Pierce's gun as "either a 22 or a 38. 
That's all I can remember. But I keep thinking it was a 38 revolver." A new detective, who had not
previously been in on the interrogation, then erroneously commented, "You think? You've been
saying 22 all along, from what I understand."
27. At this point the appellant once again remarked, "I don't remember doing any of this shit."
28. One of the detectives testified that the appellant had suddenly remembered these additional
facts as they were talking at the site.
29. Note the plural form here. It was not until his written statement that the appellant asserted
that there had only been one key in the door.
30. There was no physical evidence to verify that the girls' feet were bound.
31. One of the detectives asked the appellant if he had raped the same girl that Springsteen had
raped. The appellant replied that he had. The detective immediately asked, "Or was it another one? 
Was it the same one, or was it another one, Michael?" The appellant responded, "It was another one. 
No- I don't want to contradict myself. Yes, it was a different one, but I don't remember the face." 
At first he claimed it was a dark-haired girl. Later he thought it "had to have been the blond."


 A short time later the appellant stated that he shot the same girl he raped, and that he had shot
her in the face. None of the girls was shot in the face. The detectives registered scepticism, and
asked the appellant, "What part of the head did you put the gun, Michael?" After further questioning,
the appellant amended his story, telling them, "I remember I shot her in the head."
32. One of the detectives admitted during his testimony that he was hoping to obtain an
admission with respect to the metal scoop, but that the appellant never mentioned it.
33. When the detectives returned to this subject later, the appellant guessed it had been a bra that
he had used to gag one of the girls. When they continued to press him, again using visualization
techniques to try to enhance his recall, he claimed he had used a "white Terri-cloth towel." He could
not say what the other girls had been gagged with. The evidence shows that three of the girls were
gagged, but with socks rather than towels.
34. Springsteen did not give police a written confession. A transcript of Springsteen's police
interrogation was admitted into evidence, but for record purposes only. The jury heard only those
portions of his statement as were paraphrased in summary form by the detective, as appears in the
text, post.
35. The prosecutor argued:


 Shawn Smith confesses and said, I stood around while Justin and Lorrie and
Robert did this murder. Okay. We go talk to those three and they are like, I didn't
do it and I have an alibi. Michael Scott. I did this crime with Robert Springsteen. 
Well, let's go talk to Robert Springsteen. Well, you know what? Robert Springsteen
says, hey, I did it too. There you go. Big Difference.
36. Scott v. State, supra, at 39-41.
37. Id. at 48-51.
38. Id. at 48.
39. Id. at 51.
40. Id. at 48-49.
41. Id. at 49.
42. Id.
43. Id. at 49-51.
44. Davis v. State, 203 S.W.3d 845, 852 (Tex. Crim. App. 2006).
45. Scott v. State, supra, at 48, citing, inter alia, Harris v. State, 790 S.W.2d 568, 587 (Tex.
Crim. App. 1989).
46. Harris v. State, supra.
47. Id.
48. Davis v. State, supra, at 852-53, quoting Wesbrook v. State, 29 S.W.3d 103, 119 (Tex. Crim.
App. 2000).
49. Tex. R. App. Proc. Rule 44.2(a); Chapman v. California, 386 U.S. 18, 24 (1967); Davis
v. State, supra, at 852-53.
50. See note 26, ante.
51. Scott v. State, supra, at 49 ("Under the circumstances, Scott's accurate description of the
fire's origin could not be the product of intentional or unintentional police suggestion. And it was
very unlikely that it was simply a guess.").
52. Scott v. State, supra, at 51.
53. Satterwhite v. Texas, 486 U.S. 249, 258-59 (1988).
54. Id.
55. Scott v. State, supra, at 49-51.
56. In many circumstances, admission of a co-defendant's confession might be damaging to a
defendant's case even when, as here, his own confession is also admitted against him. In Cruz v. New
York, 481 U.S. 186 (1987), the Supreme Court addressed the question whether, in a joint trial, a jury
instruction limiting the jury's use of a codefendant's confession would be sufficient to protect the
defendant's Sixth Amendment confrontation rights. New York contended that the rule of Bruton v.
United States, 391 U.S. 123 (1968), should not apply in a case in which the defendant's own
confession, which corroborated that of his co-defendant, was admitted against him. In that event,
New York argued, the defendant's own confession did the major damage, and there would be no
reason to question the efficacy of an instruction to the jury not to also consider the codefendant's
statement against him. The Supreme Court disagreed, observing along the way:


 A codefendant's confession will be relatively harmless if the incriminating story it tells
is different from that which the defendant himself is alleged to have told, but
enormously damaging if it confirms, in all essential respects, the defendant's alleged
confession. It might be otherwise if the defendant were standing by his confession,
in which case it could be said that the codefendant's confession does no more than
support the defendant's very own case. But in the real world of criminal litigation,
the defendant is seeking to avoid his confession-on the ground that it was not
accurately reported, or that it was not really true when made.


481 U.S. at 192. In the present case, the prosecutor urged the jury to resolve any doubts the
defendant may have generated about the reliability of his own written statement by noting its
similarities to Springsteen's statement. Because such a use of a codefendant's statement is as
damaging under these circumstances as it would be in a joint trial, as in Cruz, we are unable to
conclude beyond a reasonable doubt that it was harmless.