**Affirmed as Modified and Memorandum Opinion filed May 22, 2018.**



In The

# Fourteenth Court of Appeals

## NO. 14-17-00298-CR

**BRUCE ALLEN EVANS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 300th District Court
Brazoria County, Texas
Trial Court Cause No. 77881-CR**

## MEMORANDUM OPINION

We consider two issues in this appeal from a conviction for aggravated assault of a public servant. The first issue arises out of the trial court's denial of a motion to suppress. Assuming without deciding that the trial court erred in its ruling, we conclude that any error was harmless.

The second issue arises out of a provision in the judgment that orders the reimbursement of appointed attorney's fees. Appellant contends that this provision must be deleted because there is no evidence to rebut the presumption that he was

indigent throughout the entire course of the proceedings. The State concedes that this issue has merit, and we agree. Accordingly, we modify the judgment to delete the reimbursement provision, and we affirm the judgment as modified.

## BACKGROUND

The assault in this case occurred at the end of a high-speed chase. When the chase began, appellant was clocked at driving eighty-three miles per hour, nearly thirty miles per hour over the posted speed limit. An officer pursued appellant with lights and siren engaged, but appellant did not stop. Appellant turned on his vehicle's emergency flashers and continued to speed away.

Appellant's behavior during the chase was somewhat irregular. At one point he rolled down his window and shot his middle finger at the officer behind him. Later, he slowed down and politely gestured for the officer to go around him. When the officer remained in pursuit from the rear, appellant shot his middle finger again.

Another officer tried to assist in the chase by deploying a spike strip. Appellant could have avoided the spike strip by swerving to his left and driving on the shoulder or grassy median. Instead, appellant swerved to the right, where the officer was standing. Appellant struck the officer at a high speed, causing the officer to suffer severe bodily injury.

One of appellant's tires made contact with the spike strip. As the tire began to deflate, appellant slowed down and brought his vehicle to a rest.

Officers swarmed appellant's vehicle and ordered him to exit it. Disregarding that order, appellant rolled up his window and gestured as though he might smoke a cigarette. The officers smashed the window and forcibly pulled appellant out.

After being placed under arrest, appellant explained that he was speeding to see his ex-wife because he loved her and he wanted to marry her. Appellant also

2

explained that he did not intend to hit the officer who deployed the spike strip. Appellant said that he merely wanted to scare the officer out of the way.

The officers decided to transport appellant to a hospital to obtain a blood test and to ensure that he was not injured during the arrest. As the officers waited for an ambulance, appellant started to "ramble" and tell jokes. When appellant arrived at the hospital, he exhibited more irregular behavior. He started in an agitated state, opposing medical attention. Then he became quiet, and later he told jokes. The blood test showed that he had no alcohol or drugs in his system.

At trial, appellant asserted the insanity defense. The evidence established that he had a history of mental illness, going back several years. He had previously been hospitalized twice for his illness, and in the week preceding the high-speed chase, his symptoms began to escalate. Coworkers found him talking to a dumpster and staring directly at the sun for divine inspiration. Appellant also appeared at the door of his apartment manager, announcing with exuberance that he was the next Messiah because "Jesus was tired and wanted to retire."

An expert testified that appellant suffered from bipolar disorder, and that his illness was on the severe side of the spectrum. The expert also opined that appellant was experiencing a manic episode at the time of the high-speed chase. More specifically, the expert explained that appellant was "operating under the delusional belief that either he was God or had received direct communications from God to . . . immediately seek out his ex-wife and demonstrate his capacity for unconditional love."

The expert tried to rationalize appellant's actions during the high-speed chase. Speaking of appellant's refusal to pull over, the expert said that appellant believed that if he had only reached his destination, then police would have understood that appellant's cause was "just and righteous" and that "there would be no legal

3

consequences to him." Speaking next of appellant's hand gestures, the expert said that appellant shot his middle finger because he felt that he was being bothered. The expert also posited that when appellant signaled for the officer to pass him, appellant was hoping for the officer to take the lead and assist him on his quest.

The expert acknowledged that a person who is delusional can still distinguish right from wrong, and here, the expert believed that appellant would have known that willfully injuring someone would have been wrong. However, the expert opined that appellant "was unable to tell right from wrong at the time of the offense because his judgment was so clouded and distorted by his mental illness." The expert further opined that appellant was "aiming for a clear shot" between the spike strip and the officer, but he "inadvertently" hit the officer instead.

The State did not dispute that appellant suffered from a mental illness, but it argued that appellant could distinguish right from wrong. In support of this argument, the State referred to evidence that appellant had taken precautions during other parts of the chase to avoid a collision, and that appellant had expressed regret afterwards for hitting the officer. The jury accepted the State's argument and convicted appellant of the charged offense.

## MOTION TO SUPPRESS

After he was released from the hospital, appellant was booked into the county jail and immediately placed in a mental health cell. Three days later, appellant was visited by a deputy.

The deputy recognized appellant from a recent encounter. Five days earlier (two days before the high-speed chase), the deputy was dispatched to appellant's residence to conduct a welfare check at the request of appellant's daughter. The deputy determined that appellant was "okay" and "in his right mind," even though

4

at one point during the encounter, appellant identified himself as a prophet by the name of Bruce Almighty.

When the deputy saw appellant in the mental health cell, the deputy engaged appellant in conversation, and appellant made incriminating statements. At trial, appellant moved to suppress those statements because the deputy had not warned appellant of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).

The trial court excused the jury and conducted a hearing on the motion to suppress. The deputy testified at that hearing that part of his job is to evaluate persons held in the mental health cells. The purpose of his evaluation is to determine whether such persons present a danger to themselves or to others, or whether they can be transferred into the general population of the jail.

When he approached appellant's cell, the deputy asked, "Hey, what are you doing here?" The deputy testified that the "here" in his question was referring to the mental health cell specifically, not the jail more generally. Appellant did not appreciate this distinction. He responded, "Man, I didn't mean to hit him."

The deputy testified that he did not understand appellant's response. The deputy claimed that he had not heard about the high-speed chase or the officer who had been hit. The deputy also claimed that he had been off of work for the past several days and he had not been following the news.

The deputy pressed appellant for more details: "Who?" he asked. Appellant answered, "That officer." The deputy said that he had no idea what appellant was talking about. Appellant then explained that he had been part of a high-speed chase. He said that he did not intend to hit the officer at the end of the chase. Appellant claimed that he was only trying to scare the officer so that the officer would not flatten his tires.

5

Appellant also discussed the cause of his speeding. According to the deputy, appellant "said something to the effect he was at his ex-wife's house and they had damaged her car and they called."

The deputy testified that he did not engage in this dialogue for the purpose of investigating a crime. The deputy said that he was only trying to evaluate appellant's mental health. At the end of the evaluation, the deputy determined that appellant was lucid and that he could be transferred to the general population of the jail because he did not demonstrate a risk to himself or to others.

After considering the foregoing testimony, the trial court denied the motion to suppress, citing two distinct legal theories. First, the trial court found that, even though appellant was in custody, his statements were not made during a custodial interrogation. Second, the trial court found that appellant's statements were res gestae statements. Based on these two legal theories, the trial court concluded that appellant's jail statements were admissible, even though appellant had not been warned of his *Miranda* rights. *See* Tex. Code Crim. Proc. art. 38.22, § 5 ("Nothing in this article precludes the admission . . . of a statement that is the res gestae of the arrest or of the offense, or of a statement that does not stem from custodial interrogation . . . .").

Appellant now challenges the trial court's ruling in his first issue on appeal. For the sake of argument, we will assume without deciding that the trial court's ruling was erroneous and proceed to a harm analysis for constitutional error. *See Jones v. State*, 119 S.W.3d 766, 777 (Tex. Crim. App. 2003) (using the harm standard for constitutional error to review the erroneous admission of a statement taken in violation of *Miranda*).

In a case involving constitutional error, the appellate court must reverse the judgment of conviction unless the court determines beyond a reasonable doubt that

6

the error did not contribute to the conviction. *See* Tex. R. App. P. 44.2(a). When performing this harm analysis, the question is not whether the outcome of the trial was proper, or whether the verdict was supported by the evidence. *See Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007). Instead, the question is whether the constitutional error was actually a contributing factor in the jury's deliberations. *Id.* To answer that question, we may consider several factors, including (1) whether the erroneously admitted evidence was important to the State's case, (2) whether the erroneously admitted evidence was cumulative of other evidence, (3) whether there was evidence to corroborate or contradict the erroneously admitted evidence on material points, (4) whether the erroneously admitted evidence was emphasized by the State, (5) how weighty the jury may have found the erroneously admitted evidence, and (6) the overall strength of the State's case. *Id.*

We begin with the evidence at issue. The deputy relayed three of appellant's statements to the jury, and those statements largely tracked the deputy's testimony from the hearing on the motion to suppress:

- First, the deputy testified that, in response to his question of "Why are you here?" appellant said, "Man, I didn't mean to hit him."

- Second, the deputy claimed that appellant kept talking and said, "The cops were chasing me, and I didn't mean to hit that officer. I was just trying to scare him because he was going to use those things to flatten my tire."

- Third, the deputy testified, "I asked him what started the chase, and I believe he stated something to the effect that he was at his ex-wife's house and he damaged her car and she called the police on him."

The first and second of these statements were admitted elsewhere at trial without objection. Before the hearing on the motion to suppress, the jury heard

7

testimony from one of the arresting officers that appellant gave the following statement as he was being handcuffed: "I was trying to get him out of the way. I wouldn't hurt a fly. He should have got out of the way." After the hearing on the motion to suppress, the jury heard substantially the same testimony from a different arresting officer: "[Appellant] said that he was trying to get him out of the way, that he wouldn't hurt a fly." This officer added that appellant "didn't mean to hurt him" and that he only "meant to scare him," referring again to the same officer who deployed the spike strips.

These first two statements are also consistent with statements heard on the dash cam footage of the arrest, which was published to the jury, and with a note that appellant wrote three days after the arrest. In pertinent part, the note reads as follows: "They say I hit a[n] officer [and] broke his leg (they are lying—he fell when I scared him). I just wanted him to not throw the stop tire strip [and] then I completely veered away. It was not intentional. I apologize. It was an accident."

The only new statement that the deputy relayed to the jury was the third statement, and that statement was not supported or corroborated by any other evidence at trial. In fact, the third statement was contradicted by all of the evidence that remained. The jury heard both from the arresting officers and from the dash cam footage that appellant was speeding towards his ex-wife, not away from her. One of the arresting officers testified that appellant did not appear to be speeding away from a crime scene, which would suggest that the ex-wife did not report appellant to police for damaging her car. Finally, the ex-wife testified that she did not own a car, which casts additional doubt on the third statement.

The dash cam footage clearly depicted appellant striking the officer with his vehicle. Appellant did not question the authenticity of that video evidence, or whether the State had proved the essential elements of the offense. Both sides agreed

that the only fact question was whether appellant had been insane at the time of the offense. To prove that defense, appellant was required to show by a preponderance of the evidence that, as a result of a severe mental disease or defect, he did not know that his conduct was wrong. *See* Tex. Penal Code § 8.01. The State did not dispute that appellant suffered from a mental illness. The ultimate issue, then, was whether appellant knew that his conduct was wrong.

The jury did not likely factor the third statement into its determination of this ultimate issue. As we explained above, the third statement was contradicted by every other item of evidence at trial, including, most notably, the video evidence. The State did not even mention the third statement in its closing argument.

The State did refer to the other two statements, but those statements were cumulative of other evidence. The jury heard the same statements from the live testimony of the arresting officers, as well as from the dash cam footage, and the State referred to this cumulative evidence in its closing argument.

In an effort to discredit appellant's defensive theory, the State attacked the expert for failing to review all of the evidence. The State also emphasized evidence that demonstrated that appellant could distinguish between right and wrong. For instance, the State drew attention to evidence that appellant knew that driving at high speeds and injuring others would be wrong. The State also referred to evidence that appellant had an awareness of what conduct was proper because he was careful around other cars (rather than "bumping people out of the way"), he stopped for traffic at a dangerous intersection, and he checked for children when passing through a school zone. Finally, the State referred to appellant's apology note as additional evidence that appellant knew that his conduct was wrong.

When conducting a harm analysis for constitutional error, an appellate court must ask itself whether there is a reasonable possibility that the error moved the jury

9

from a state of non-persuasion to one of persuasion on a particular issue. *See Scott*, 227 S.W.3d at 690. For three reasons, we cannot find such a possibility in this case: (1) the first two statements were cumulative of other evidence that was admitted without objection; (2) the third statement was inconsistent with the entire body of evidence (including video footage), and it was never emphasized by the State; and (3) even without these three statements, the jury had a substantial basis for concluding that appellant knew that his conduct was wrong. We are satisfied beyond a reasonable doubt that any error in the admission of the statements was not a contributing factor in the jury's deliberations. We therefore conclude that any such error was harmless.

## ATTORNEY'S FEES

The judgment in this case includes a provision that orders appellant to reimburse the State for the costs of his appointed trial counsel. Appellant argues that the trial court erred by ordering this reimbursement because he is indigent and because there is no evidence showing that he has the financial resources or ability to pay for his appointed counsel.

The trial court has the authority to order the reimbursement of appointed attorney's fees "if the judge determines that a defendant has financial resources that enable the defendant to offset in part or in whole the costs of the legal services provided." *See* Tex. Code Crim. Proc. art. 26.05(g). "The defendant's financial resources and ability to pay are explicit critical elements in the trial court's determination of the propriety of ordering reimbursement of costs and fees." *Mayer v. State*, 309 S.W.3d 552, 556 (Tex. Crim. App. 2010). We review the evidence in the light most favorable to the judgment when deciding whether the record contains legally sufficient evidence to support these elements. *Id.* at 557. Absent sufficient

evidence, the defendant may not be ordered to pay attorney's fees. *See West v. State*, 474 S.W.3d 785, 795 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

Appellant was found to be indigent before trial. By law, he is presumed to have remained indigent for the remainder of his proceedings unless a material change in financial circumstances occurred. *See* Tex. Code Crim. Proc. art. 26.04(p). Our record does not reveal any evidence of changed financial circumstances, and the State concedes that there is none. Because there is no evidence that appellant has the financial resources or ability to pay for the costs of his appointed trial counsel, the reimbursement provision is erroneous and should be deleted.

## CONCLUSION

We modify the judgment by deleting the reimbursement provision and affirm the judgment as modified.

/s/    Tracy Christopher
Justice

Panel consists of Chief Justice Frost and Justices Christopher and Jamison.
Do Not Publish — Tex. R. App. P. 47.2(b).