In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

### NO. 09-22-00157-CR
_____

**JEFFREY MERRITT MCCUMBER JR., Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 411th District Court**
**Polk County, Texas**
**Trial Cause No. 28,302**

## MEMORANDUM OPINION

A jury convicted Jeffrey Merritt McCumber Jr. of continuous sexual abuse of a young child, "Angie," and assessed punishment at sixty years of confinement.[1] *See* Tex. Penal Code Ann. § 21.02. In two issues, McCumber complains the trial court erred by: 1) allowing the outcry witness to testify remotely; and 2) denying his

_____

[1]We use pseudonyms to refer to the alleged victim, a minor child, and the child's family members. *See* Tex. Const. art. 1, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal judicial process").

1

Motion for Mistrial when two jurors were released by the bailiff and replaced by alternate jurors. As discussed below, we reverse the trial court's judgment and remand for a new trial.

## I. BACKGROUND

A. Abuse Allegations: Testimony of Angie and Testimony of Mother

McCumber is Mother's ex-boyfriend. They met in 2014 and moved in together shortly thereafter. Their relationship continued until March 2019, when Mother left McCumber. Mother and Angie testified that they lived with McCumber's father for a period, and they lived in a travel trailer on McCumber's sister's property.

Angie was twelve years-old during the trial. Angie testified that between the ages of six to eleven, Mother lived with McCumber; however, Angie only lived with them part of the time. Angie recalled McCumber doing things to her that made her feel bad, which she felt uncomfortable talking about. She did not recall the first time McCumber did something bad to her, but recalled they were living in the travel trailer, which she estimated was sometime around 2016 when she was around six or seven. Angie testified that McCumber touched her vagina but did not remember what he used to touch her. She initially denied that McCumber did anything else that made her feel uncomfortable.

2

At several points during her testimony, the record describes Angie "breathing distressfully" and she did not answer the pending question. The trial court briefly recessed the proceedings and conducted a hearing during which she testified that she had trouble being in the same room as McCumber and would prefer to be away from him in a less formal environment. Angie's testimony then resumed via closed-circuit video, over no objection from the defense.

Angie testified McCumber touched her every other night for at least several months. At certain times, Angie testified she did not recall the nature of the abuse or how often it happened. Angie said she did not remember telling the forensic interviewer that McCumber touched her female body part with his hand several times until she watched the video. Later, Angie testified that McCumber touched her vagina with his hand and that he did other things to her of a sexual nature, but said, "I don't really remember that much though." Angie then testified there were times that McCumber made her put her mouth on his penis, but when asked how many occasions, Angie answered, "I don't really remember all that much." She said it happened more than once. Angie remembered referring to McCumber's penis as a "sausage" in her forensic interview and explained she used that word, because "I thought I was going to get in trouble if I just said the real word."

Angie testified that the first person she told about the abuse was Alyssa Crawford. The same day she told Crawford, Angie saw McCumber riding a bike,

3

which scared her. Crawford then started asking Angie questions, because she did not know why Angie became scared. Angie explained that McCumber threatened her and said if she ever told anyone, he would hurt Angie and her Mother, which is why she waited to tell.

Mother testified when she left McCumber in 2019, Angie was living with McCumber's cousins and no longer lived with Mother and McCumber. Angie testified she lived with McCumber's cousins for about two years. Mother also said that Angie only lived with them for a few months, early in their relationship. Around 2019, Mother ended her relationship with McCumber, and Angie began living with Mother again in 2020. Mother testified that Angie never reported the abuse to her and since her outcry, Angie has not wanted to discuss it at all, rather she seems to want to "just close it out like it never happened."

B. Hearing Regarding Remote Testimony of Outcry Witness and Ruling

The State sought to have Crawford, the outcry witness, testify remotely, but McCumber objected, so the trial court held a hearing outside the jury's presence to decide whether to allow Crawford to testify without being physically present at trial. During the hearing, the State called Polk County District Attorney Investigator Jason Thomas to explain the reasons the State wanted the court to allow Crawford to testify without being physically present in court. Thomas explained that he received the subpoenas from the clerk's office on May 2 and began trying to locate the witnesses.

4

Initially, he could not locate Crawford. They had two addresses for Crawford, which he checked, but she no longer lived at either one. He described additional steps he took to locate Crawford by leaving a business card at her old address and attempting to contact her father in North Texas, which failed. Thomas testified he searched a computer database of public records but did not locate her that way. Thomas explained he could not find Crawford using social media, but Angie managed to locate her on Facebook by using a name other than "Alyssa Crawford." Angie then told Thomas that Crawford sent pictures showing she was living in Colorado. Once he had information she was living there, he checked that state for a driver's license and found an address in Pagosa Springs, Colorado. Thomas testified that on May 9, he learned Crawford was living in Colorado. Thomas explained that on May 9, he contacted the sheriff's department in that county for their assistance, but on May 10, before the sheriff's department could do so, Angie provided him Crawford's phone number, and he spoke to her the same day. Thomas testified that Crawford told him that her husband fractured his spine, could not move around, and needed someone there to take care of him. Thomas explained they "made arrangements where we could get her here and back on the same day[,]" and Crawford tried to arrange for family to take care of her husband but could not. Thomas also testified that Crawford "remembered she has a court hearing today at 2:00" relating to an old criminal

5

charge in Colorado, which he confirmed with the county. Thomas said that Crawford would be available to testify by Zoom.

During the hearing, Crawford also testified she moved from Polk County a month or two after reporting to police that McCumber sexually abused Angie. Crawford explained she moved because she was receiving threats from McCumber's family for making the report. When asked who in particular was threatening her, she claimed "[i]t was a number of different people. Our house got broke into three different times. People were starting to drive by and say that we were fixing to die." Crawford testified she did not have a registered phone number, she rented her property in a friend's name, and "stayed as far under the radar as I could because the fear of [McCumber's] family and friends finding me." She testified she was scared to come back to Polk County to testify and did not trust that the district attorney's office would protect her. Crawford added that her husband had a broken back, was homebound, and she was his caregiver. Crawford said she "asked around" to try to locate someone who could care for him if she returned to Texas to testify and could not find an alternate caregiver. Finally, Crawford testified she had a court appearance scheduled for that afternoon in Colorado in a criminal matter. Crawford testified that the main reason she did not want to return to testify was due to fear and denied she had anything physically wrong that prevented her from traveling.

The State argued the necessity of Crawford testifying remotely, noting her husband's medical circumstances, and making herself difficult to find. The State distinguished these facts from the *Haggard* case and noted it submitted its subpoena application on April 27 but did not receive it until May 2. The defense argued that Crawford should not be allowed to testify remotely, the case was put on the trial docket almost a month before, and it took Thomas eight days to find her. The defense asserted that if the State had exercised due diligence and started looking for her earlier, they would have realized there was an issue and could have moved to continue the case. The defense further argued that under *Haggard*, there was a constitutional right to confront and cross-examine witnesses, and Crawford was "an integral witness." The defense also argued that public policy did not allow for an exception in these circumstances.

When the hearing ended, the trial court ruled that Crawford could testify remotely. However, the trial court did not make case specific findings relevant to supporting its conclusion of necessity to support its decision to excuse the general requirement under the Sixth Amendment that a witness be physically in the courtroom when they testify in a trial.[2]

---

[2] U.S. CONST. amend. VI.

C. Testimony of Outcry Witness Alyssa Crawford

Crawford testified remotely via Zoom. Crawford said that in June 2020, she picked Angie up from Mother. As they exited Angie's neighborhood, they saw McCumber riding a bicycle in front of them. Crawford testified that Angie panicked and tried to climb in the floor of Crawford's vehicle, because she did not want McCumber to see her. Crawford explained that later that evening, Angie became very upset when eating hot dogs at her house and told Crawford that McCumber used to wake her up at night "by putting his hands in her pants and touching her private areas" then Angie said he made her "suck on his sausage, because she was uncomfortable using the word 'penis[.]'" Crawford testified that Angie said it happened about ten times, started when she was seven and went on for years. Crawford explained that when Angie lived with Mother and McCumber, Angie cried every time Crawford took her home, because she did not want to go back but never said why. Angie told Crawford she did not talk about this sooner, because McCumber threatened to kill Mother, and she did not want to get in trouble. Crawford told Mother she was taking Angie to the police station and Mother met them at the Polk County Sheriff's Department in Livingston. Crawford said that she later gave a statement to the Sheriff's Department that was consistent with her testimony.

D. Testimony of Kaycee Hendrix

Kaycee Hendrix, who conducted Angie's forensic interview, testified that Angie could answer her questions, seemed mature for her age, and could distinguish between the truth and a lie. Hendrix said that Angie was uncomfortable talking about her relationship with McCumber and seemed embarrassed. Rather than answer verbally, Angie asked if she could write her answers down, which she did. Hendrix testified that Angie made an outcry of abuse and described the sexual activity in writing. Hendrix testified she did not see any indication that someone told Angie what to say.

E. Testimony of Krysti Griffin

Krysti Griffin, the sexual assault nurse examiner (SANE), also testified. In June 2020, Griffin examined Angie, who was referred by law enforcement. Griffin obtained a history from Mother then from Angie. She noted that Angie seemed "immature for her age" and "how she related to her mother seemed immature." Griffin testified the abuse allegedly occurred in 2016, four years before the exam, and they named McCumber as the perpetrator. Griffin testified that Mother reported that McCumber had touched Angie inappropriately and made her perform oral sex on him. Griffin read the narrative Angie provided without objection, but noted Angie could not talk about it, she had to write it out. The narrative read by Griffin was as follows:

"Patient reports: My mom started dating a guy – his name is Jeffery – for maybe about three years. We lived with his dad for a while. Then we lived with his sister, then we got a trailer and put it right next to his sister's house. That's the only place I lived with him. I'm not sure what day but it was like 3 in the morning, he would come in my room. I wake up at like 4 or 5 to go to school. He would do it right before my mom got up, and he would hear her and then run to the living room and act like he was just waking up. He would try to touch my vagina.

. . .

So like a normal person, I would try to pretend I was asleep. I would go to my room about 9 at night and basically stay up all night. He did like that every other night. That was like four years ago. I haven't saw [sic] him in like four years."

Griffin confirmed she was not testifying about the patient's or Mother's veracity.

 F. Testimony of Lieutenant Craig Finegan

Lieutenant Craig Finegan of the Polk County Sheriff's Office testified that he oversees the Criminal Investigation Division and handles child sex abuse cases. Finegan testified that they received a report from Crawford, who Angie outcried to. Crawford and Angie came to the sheriff's office and met with a deputy. Finegan explained that this situation involved a delayed outcry, so they did not need a SANE exam immediately. They scheduled the forensic interview within a few days, which Finegan attended. Finegan testified that Angie alleged oral penetration. Finegan testified that Angie provided consistent information to the SANE and Crawford, and Angie provided appropriate details. Finegan agreed the case came down to a credibility issue and timeframe issue of whether it was possible. Finegan testified

10

that Angie was interviewed several times, he reviewed all the statements, and "there were no signs" that the incident did not happen as the girl said.

## G. Verdict

The jury convicted McCumber of continuous sexual abuse of a young child and assessed punishment at sixty years of confinement.

## II. ANALYSIS

## A. Was it Error to Allow the Outcry Witness to Testify Remotely?

In his first issue, McCumber argues that the trial court committed reversible error by allowing the outcry witness, Crawford, to testify remotely. Specifically, he contends that although the trial court found there was a necessity, the trial court failed to provide case-specific reasons for the necessity finding and the record did not support a finding that Crawford's remote testimony furthered an important public policy. We agree.

### 1. Confrontation Clause Generally

The Confrontation Clause set forth in the Sixth Amendment states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. CONST. amend. VI. The United States Supreme Court has long recognized the Confrontation Clause protects a criminal defendant's right to physically confront witnesses testifying against him. *See Haggard v. State*, 612 S.W.3d 318, 324 (Tex. Crim. App. 2020) (citing *Coy v. Iowa*, 487 U.S. 1012,

11

1017 (1988)); *see also Maryland v. Craig*, 497 U.S. 836, 844 (1990). This does not mean that the Confrontation Clause affords criminal defendants the "*absolute* right to a face-to-face meeting with witnesses against them at trial." *Craig*, 497 U.S. at 844. Although the right is not absolute, face-to-face confrontation may not "easily be dispensed with." *Id.* at 850.

2. Necessity and Case-Specific Findings

The trial court's conclusory finding that "there is a necessity shown" is insufficient to establish why allowing Crawford to testify remotely was necessary to further an important public policy. Both *Craig* and *Coy* help explain why, since both cases involved statutes that protected child witnesses who were testifying against those who harmed them and the defendant's rights under the Confrontation Clause. *See id.* at 840–42; *Coy*, 487 U.S. at 1014. In *Coy*, the Court noted that whether exceptions existed to the right to face-to-face confrontation were left for "another day" but "would surely be allowed only when necessary to further an important public policy." *Coy*, 487 U.S. at 1021 (citations omitted). Subsequently, the Supreme Court in *Craig* held that exceptions could exist to in-person confrontation, recognizing the State's compelling interest in protecting minor victims of sex crimes from the additional trauma and embarrassment created by face-to-face confrontations in court. *See Craig*, 497 U.S. at 852.

In *Coy*, the procedure that was challenged involved a screen placed between the defendant and two witnesses, which prevented the children from seeing the defendant while they testified against him. *See Coy*, 487 U.S. 1012, 1014-15. In that case, the trial court failed to make particularized findings about the procedure it followed being necessary to further an important public policy. *Id*. at 1021. Without the individualized finding that these "particular witnesses needed special protections," the Supreme Court concluded that "the judgment here could not be sustained by any conceivable exception" to the Confrontation Clause. *Id*.

In *Craig*, the Supreme Court discussed its prior holding in *Coy*, noting that in *Coy*, the use of the procedure violated the defendant's right to confront the witnesses. *See Craig*, 497 U.S. at 844–45 (citing *Coy*, 487 U.S. at 1014–15, 1021). The Court went on to explain that "any exception . . . 'necessary to further an important public policy'" meant "only upon a showing of something more than the generalized, 'legislatively imposed presumption of trauma' underlying the statute at issue in that case." *Id.* (quoting *Coy*, 487 U.S. at 1021). *Craig* differed from *Coy* in that the trial court made "*individualized findings*" that each child witness needed special protection, which left the Supreme Court to answer the question reserved in *Coy*: "whether use of the procedure is necessary to further an important state interest." *Id.* at 845, 852 (emphasis added). The Court in *Craig* examined a Maryland statute that allowed "a judge to receive, by one-way closed-circuit television, the testimony of

13

an alleged child abuse victim upon determining that the child's courtroom testimony would result in the child suffering serious emotional distress, such that he or she could not reasonably communicate." *Craig*, 497 U.S. at 840. The Supreme Court then answered that question by holding face-to-face confrontation might be dispensed with only when (1) it furthered an important public policy, and (2) the reliability of the testimony could be assured where the witness testified under oath, was fully cross-examined, and the judge, jury, and defendant could see the victim. *See id.* at 850, 857. Under the statute at issue in *Craig*, the Supreme Court explained that to meet constitutional requirements, individualized findings were required before a court could allow a witness to testify remotely on whether the child would be traumatized by the defendant's presence in the courtroom, not by the courtroom generally, and whether the child would suffer more than de minimis emotional distress if required to testified in the defendant's presence. *Id*. at 855-857.

At issue here is the first prong, specifically whether the trial court made the requisite case specific findings that Crawford's remote testimony was necessary to further an important public policy. *See id.*; *see also Haggard*, 612 S.W.3d at 327. We do not address the second prong (reliability) in our analysis. *See Haggard*, 612 at 327 (explaining the Court did not need to resolve the reliability issue where its holding relied on the remote testimony "furthered an important public policy").

14

In *Haggard*, the Texas Court of Criminal Appeals addressed a witness's remote testimony in a criminal proceeding and whether it violated the Confrontation Clause. *See id.* at 320–21. In holding that the remote testimony violated the Confrontation Clause, the Court reiterated the requirement of a "'finding of necessity'" that is "'case-specific.'" *See id.* at 325 (quoting *Craig*, 497 U.S. at 855). "[T]he trial court commits constitutional error when it dispenses with the accused's confrontation right based on an *insufficient* finding of necessity." *Finley*, 655 S.W.3d at 513 (citing *Haggard*, 612 S.W.3d at 327–28). While the trial court offered evidence at the hearing before making a generic finding of "necessity," its finding was not case-specific. *See Haggard*, 612 S.W.3d at 325 (citation omitted) (noting precedent's emphasis on a trial court's case-specific finding of necessity); *Finley*, 655 S.W.3d at 515 (trial court erred when it allowed witness to testify wearing a mask "in the absence of a sufficient particularized finding as to her particular need to do so"); *see also Craig*, 497 U.S. at 842–43 (providing case specific findings that testifying in the courtroom would result in each child witness suffering serious emotional distress such that each of them could not reasonably communicate).

*Romero v. State*, 173 S.W.3d 502 (Tex. Crim. App. 2005), also helps to illustrate what circumstances will not warrant dispensing with face-to-face confrontation. There, the Court of Criminal Appeals discussed compelling interests that might justify a procedure that excused the defendant's right to in-person

15

confrontation. *See id.* at 506. In concluding that the defendant's right to confrontation was violated where an adult witness testified in disguise because he was afraid of the defendant, the Court explained,

> At best, the disguise worked to allay the witness's subjective fear of retaliation. But some degree of trauma is to be expected in face-to-face confrontations. Calming an *adult* witness's fears is quite a different thing from protecting a child victim from serious emotional trauma. Adults are generally considered to be made of sterner stuff and capable of looking after their own psychological well-being. And the difference is especially great when the adult witness is not the victim, but merely a bystander who observed events, and when the basis of the witness's fear is simply that the defendant committed a violent crime and gave the witness a bad look. If those circumstances are sufficient to justify infringing on a defendant's right to face-to-face confrontation, then such infringement can be carried out against anyone accused of a violent crime. That outcome would violate the principle that face-to-face confrontation may be deprived only in exceptional situations.

*Id.*

Crawford offered three excuses for not testifying in person. At trial, the State did not argue any of these reasons furthered an important public policy. *See Craig*, 497 U.S. at 856; *Haggard*, 612 S.W.3d at 327. The trial court failed to specify which of these reasons it relied on and why they presented a compelling public policy interest warranting a court to extend an exception to the Confrontation Clause's requirement that allows a defendant to confront the witnesses who testify against him in court.

Even though the trial court failed to make any findings, we will discuss each of the excuses Crawford offered to explain her absence in turn. First, she said she is

16

her husband's caregiver in their home in Colorado, and he needs her there since he suffers from a broken back. Yet Crawford testified that nothing physically prevented her from traveling, and she didn't present any evidence that she would suffer a financial hardship if she was required to pay someone to take care of him while she was gone. To be fair, Crawford did testify that she "asked around" but could not locate anyone to care for him, but she did not specify what those inquiries entailed. Still, the "mere inconvenience to a witness[]" is insufficient to dispense with a defendant's rights guaranteed by the Confrontation Clause. *See Haggard*, 612 S.W.3d at 327 (noting that traveling for court to testify can be frustrating and difficult for reasons including finances, hectic schedules, sheer distance, etc., but such things were not sufficient to allow remote testimony). Crawford denied that she had any health issues that would prevent her traveling. The State doesn't point to a Texas statute like the Maryland statute that allows a witness to testify remotely, and without individualized findings a trial court must make before allowing a witness to testify remotely, this record doesn't support a conclusion that a compelling public policy interest warrants allowing Crawford to testify remotely given the role she had as the outcry witness in the trial.

Second, Crawford testified that she had a scheduled court appearance in Colorado at 2:00 the afternoon testimony began to address a criminal matter of her own, which the district attorney's investigator confirmed. That said, the trial court

17

didn't make an individualized finding that the court appearance in Colorado was the reason it was necessary to allow the witness to testify remotely and a sufficient reasons to justify dispensing with McCumber's right to confront her in court.

For example, the trial court did not explain *why* Crawford could not have appeared in Texas for trial on a day that didn't conflict with the day she was scheduled to appear in court in Colorado. And the trial court didn't explain what efforts it made, if any, to contact the court in Colorado to determine whether the court scheduling issues to the extent they conflicted could be ironed out so that McCumber's constitutional rights could be preserved.

Even though the State has an interest in ensuring that criminal defendants appear for proceedings, it did little during the hearing to develop the record about whether the day Crawford was scheduled to appear the trial could be rescheduled for another day. The State didn't immediately subpoena Crawford when it learned on April 20, 2022, that the matter was set for trial on May 9, as it waited until April 27 to request subpoenas, which it then received from the clerk's office on May 2. The jury was sworn on Monday, May 9, and testimony did not begin until Thursday, May 12. The record shows it took the district attorney's office eight days to locate Crawford. "[W]e do not think it is an important public policy to allow the State to procure a witness's testimony remotely when the State had sufficient time and ability

to subpoena the witness, and the witness was available to appear and testify, but the State chose not to." *Haggard*, 612 S.W.3d at 327.

Third, and the reason Crawford mainly relied on, was that McCumber's friends and family had threatened her, and she was afraid to return to Texas. A careful review of her testimony from the hearing shows Crawford never accused McCumber of threatening her or of inducing others to do so. Instead, she alleged that his family and friends did so. She could not specifically identify who threatened her; in the hearing, she simply responded: "It was a number of different people." Crawford complained her house was broken into three times and "[p]eople were starting to drive by and say that we were fixing to die," but neither she nor the State explained how McCumber was tied to these break-ins or "people." Crawford told the court given the past threats, she was "in a bit of fear to show up in person because of the family and friends that [McCumber] does have in the area[.]" Despite testifying that she did not trust the district attorney's office to protect her if she returned and had not protected her in the past, neither she nor the State ever suggested Crawford reported the threats to law enforcement.

As the Court of Criminal Appeals explained, "some degree of trauma is to be expected in face-to-face confrontations." *See Romero*, 173 S.W.3d at 506. On this record and given that Crawford is an adult witness, we cannot say that having a "bit of fear to show up" based on threats made by the defendant's unidentified friends

19

and family warrants dispensing with a defendant's constitutional rights. *Id*. Were we to dispense with the right to physical confrontation in cases when an adult witness expressed "a bit of fear" from threats from unnamed sources when those fears are not proven to be grounded on anything more than the witness's subjective belief, an adult witnesses would rarely have to testify in-person. *See id.*

We conclude the trial court failed to make the required individualized findings on necessity and that, on this record, the State failed to show that allowing Crawford to testify remotely was necessary to further an important public policy. *See Haggard*, 612 S.W.3d at 325, 327; *Finley*, 655 S.W.3d at 515 (holding trial court erred by allowing victim to testify while wearing a mask in the absence of a sufficient particularized finding about her need to do so); *see also Craig*, 497 U.S. at 845, 852.

B. Was the Denial of Face-to-Face Confrontation Harmful?

Having determined the trial court erred by allowing Crawford's remote testimony, we turn to our harm analysis. We review a denial of physical, face-to-face confrontation for harmless error. *See Haggard*, 612 S.W.3d at 328; *see also Coy*, 487 U.S. at 1021. Constitutional error is harmful unless we determine "beyond a reasonable doubt that the error did not contribute to the conviction or punishment." Tex. R. App. P. 44.2(a); *see also Haggard*, 612 S.W.3d at 328. "The State has the burden, as beneficiary of the error, to prove that the error is harmless beyond a reasonable doubt." *Haggard*, 612 S.W.3d at 328 (citations omitted).

20

When a defendant is denied physical confrontation, our harm analysis "cannot include consideration of whether the witness' testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation[]" since "such an inquiry would obviously involve pure speculation." *Coy*, 487 U.S. at 1021–22; *Haggard*, 612 S.W.3d at 328. Rather, we assess harm based on "'the remaining evidence.'" *Haggard*, 612 S.W.3d at 328. We do not employ the presumption set forth in *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986), that the damaging potential of the cross-examination was fully realized in denial of confrontation cases. *See Haggard*, 612 S.W.3d at 329. Even so, four of the *Van Arsdall* factors are helpful in determining harm, including 1) the importance of the witness's testimony in the State's case, 2) whether the testimony was cumulative, 3) presence or absence of evidence corroborating or contradicting the witness's testimony on material points, and 4) the overall strength of the prosecution's case. *See id.* (noting these factors are helpful in determining harm) (citing *Van Arsdall*, 475 U.S. at 684). Importantly, we should also consider "any circumstance apparent in the record that logically informs the harm issue." *See id.* (citing *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011)).

Crawford's testimony was significant for the prosecution's case. The State characterized her as "important[,]" and the defense described her as "integral."

21

Crawford testified about what Angie told her regarding the abuse, the circumstances of the outcry, and Angie's demeanor.

Although portions of Crawford's testimony may have been cumulative, including that McCumber touched Angie's vagina and the fact that oral sex occurred, other portions of her testimony were not. Crawford relayed the words Angie used during the outcry that McCumber made her "suck on his sausage" and said Angie became very emotional while eating a hot dog. Crawford observed and testified to Angie's reaction to seeing McCumber on a bicycle earlier in the day of her outcry. Crawford told the jury that when Angie saw him, she panicked, unfastened her seatbelt, and tried to climb in the floorboard of Crawford's car and was the sole witness to do so.

Some of Crawford's testimony was contradicted and some corroborated by other evidence. No other evidence corroborated or contradicted Angie's demeanor during the outcry. Angie's testimony that the abuse started when she was six or seven aligned with Crawford's testimony that Angie reported the abuse began when she was about seven, though Angie testified it happened every other night for about a year whereas Crawford said the abuse went on for three years and occurred ten times. Also, Crawford's testimony corroborated Angie's term for describing McCumber's sexual organ, which Angie said she used because she was afraid she would "get in trouble" for saying, "the real word." Angie's narrative read by the SANE during her

testimony did not mention oral sex, but elsewhere the SANE testified that Angie alleged oral penetration. Also consistent with Crawford's testimony, Lieutenant Finegan said generally that Angie alleged oral penetration.

Absent Crawford's testimony, we cannot characterize the prosecution's case as strong. We know that child victims may struggle to relay details about their abuse given the time that may have elapsed, their age when the abuse occurred, and the ensuing trauma. That said, Angie testified repeatedly that she did not recall what McCumber used to touch her or where, how many times it occurred, or giving an interview. At other times, Angie testified McCumber touched her vagina with his hand and did other things of a sexual nature but then said, "I don't really remember that much[.]" Elsewhere, Angie testified that McCumber made her put her mouth on his penis more than once. When asked by the defense about her forensic interview and whether her testimony was "remembering based off of just watching the video from before[,]" Angie responded, "I think so, because I didn't really remember that much from the video because I didn't' even – because whenever I watched the video I didn't like remember a lot of stuff."

Finally, we turn to other circumstances in the record that logically inform the harm issue. *See id.* Lieutenant Finegan testified that this case comes down to credibility and timeframe issues. Discrepancies also existed in the testimony on when the abuse allegedly occurred. Mother testified that her relationship with

23

McCumber began in 2014 and ended in 2019, and Angie only lived with them for a few months early in their relationship. On the other hand, Angie testified that she lived with McCumber two to three years. Angie testified that the abuse began in 2016, and occurred when they lived in a travel trailer. The State focused on Crawford's outcry testimony in opening statements. In its closing statement, the State emphasized Crawford's testimony that this occurred over several years. In closing arguments, the State also explained that as the outcry witness, Crawford could testify to hearsay statements Angie made and noted Crawford's testimony about the circumstances of the outcry. The defense likewise emphasized Crawford's testimony concerning where the abuse allegedly occurred and the circumstances of the outcry. Additionally, the record shows that the jury had questions about Angie's testimony and portions were read back to the jury, including what she told Crawford. The testimony read for the jury was:

> QUESTION: Were there times where he exposed his penis or his male sex organ to you?
> ANSWER: Yes, sir.
> QUESTION: And were there times that he made you put your mouth on that?
> ANSWER: Yes, sir.
> . . .
> QUESTION: Do you remember making a statement to Alyssa Crawford?
> ANSWER: Kind of, but not that much. I don't really remember that much from it.
> . . .
> QUESTION: Do you remember telling [Crawford] that he made you put your mouth on his penis as many as ten times?

24

ANSWER: Not really. I don't know.
QUESTION: Did that happen on more than one occasion?
ANSWER: Yes, sir.

After examining the remaining evidence and considering the emphasis placed on Crawford's testimony as the outcry witness, we are unable to satisfy ourselves beyond a reasonable doubt that Crawford's testimony did not move "'the jury from a state of non-persuasion to one of persuasion'" and cannot say the error did not contribute to the conviction. *See Langham v. State*, 305 S.W.3d 568, 582 (Tex. Crim. App. 2010) (quoting *Scott v. State*, 227 S.W.3d 670, 690–91 (Tex. Crim. App. 2007)); *Haggard v. State*, Nos. 09-17-00319-CR, 09-17-00320-CR, 2021 WL 2557955, at *6 (Tex. App.—Beaumont June 23, 2021, pet. ref'd) (mem. op., not designated for publication) (citations omitted). Based on the record, the State failed to meet its burden of establishing from the other evidence that the error was harmless beyond a reasonable doubt. *See Haggard*, 612 S.W.3d at 328; *see also* Tex. R. App. P. 44.2(a). Therefore, we sustain McCumber's first issue. We do not address McCumber's second issue, because even if sustained, it would afford him no greater relief. *See* Tex. R. App. P. 47.1.

## III. CONCLUSION

Having sustained McCumber's first issue, we reverse the trial court's judgment and remand for a new trial.

25

REVERSED AND REMANDED.

_____
W. SCOTT GOLEMON
Chief Justice

Submitted on February 27, 2023
Opinion Delivered June 21, 2023
Do Not Publish

Before Golemon, C.J., Horton and Wright, JJ.