

# IN THE
# TENTH COURT OF APPEALS

### No. 10-23-00008-CR

**THE STATE OF TEXAS,**

**Appellant**

 **v.**

**NERIAH LOUIS ROBERTS,**

**Appellee**

**From the 278th District Court
Walker County, Texas
Trial Court No. 25879**

## O P I N I O N

The State of Texas appeals the trial court's order granting Appellee Neriah Louis

Roberts's motion for new trial. In a single issue, the State contends the visiting judge who

ruled on the motion for new trial abused his discretion. We reverse the trial court's order

granting Roberts's motion for new trial and render judgment reinstating the trial court's

judgment of conviction and sentence.

## Background

On February 1, 2008, Tierra Adams, who was pregnant, was reported missing by her mother. Roberts was with Adams on January 27, 2008, and fled to Venezuela on February 13. On March 26, 2008, Adams's body was found in a shallow grave in a wooded area of Walker County.

Roberts was extradited in 2015 and convicted of Adams's murder in 2022. The jury assessed punishment at confinement in the Texas Department of Criminal Justice—Institutional Division for fifty-five years and a $10,000 fine. Roberts filed a motion for new trial in which he asserted that a crucial witness had come forward with new evidence and, the day after the trial court denied Roberts's motion to suppress, the Fourteenth Court of Appeals had issued an important new case, *Hankston v. State*, 656 S.W.3d 914 (Tex. App.—Houston [14th Dist.] 2022, pet. ref'd) (op. on remand), requiring suppression of cell phone evidence. A visiting judge heard and granted Roberts's motion for new trial. The State of Texas appeals that ruling. *See* TEX. CODE CRIM. PROC. ANN. art. 44.01(a)(3).

## Motion for New Trial

In a single issue, the State asserts the visiting judge abused his discretion by granting the motion for new trial. It first contends that the visiting judge granted a new trial without hearing the facts adduced at the trial or having a record of the trial proceedings. The record before us does not indicate whether or not the visiting judge

read the record of the trial. Due to our disposition of the State's issue, we need not address this argument. *See* TEX. R. APP. P. 47.1; *State v. Zalman*, 400 S.W.3d 590, 593 n.4 (Tex. Crim. App. 2013).

In addressing Roberts's arguments in the motion, the State contends that the newly discovered evidence does not satisfy the applicable four-part test warranting a new trial. Additionally, it argues the decision in this case would not have been altered by *Hankston* because the trial judge analyzed this case in light of *Carpenter v. United States*, 138 S. Ct. 2206 (2018). Finally, the State contends that the trial court's ruling on the motion to suppress, if erroneous, was harmless.

STANDARD OF REVIEW

We review a trial court's grant or denial of a motion for new trial for an abuse of discretion. *Najar v. State*, 618 S.W.3d 366, 371 (Tex. Crim. App. 2021). We view the evidence in the light most favorable to the trial court's ruling, defer to the trial court's credibility determinations, and presume that all reasonable fact findings in support of the ruling have been made. *State v. Thomas*, 428 S.W.3d 99, 104 (Tex. Crim. App. 2014). We will reverse the trial court's ruling only if it is arbitrary or unsupported by any reasonable view of the evidence. *Najar*, 618 S.W.3d at 372. There is generally no abuse of discretion in granting a new trial if the defendant (1) articulated a valid claim in the motion, (2) produced evidence or pointed to record evidence that substantiated his claim, and (3)

showed prejudice under applicable harmless error standards. *State v. Arizmendi*, 519 S.W.3d 143, 148 (Tex. Crim. App. 2017).

<u>Newly Discovered Evidence</u>

In his motion for new trial, Roberts asserted that a witness, Dora Trevino, came forward with what he described as critical new information, vital to a factual determination of guilt. At the hearing on the motion for new trial, Trevino explained that she knows Roberts and his family because they were neighbors for twenty years. Trevino testified that, one morning at 4:30 a.m., she saw an African American woman walking on North Houston Rosslyn. She described her as six months pregnant, about five feet, six inches tall, and weighing around 160 pounds. She drove past the woman without stopping. At the time she saw the woman, Trevino was unaware of Adams's disappearance. A few days later, she saw the missing person's report, contacted Roberts's mother, and told her what she had seen. On cross-examination, she clarified that she was not saying she saw Adams.

A new trial shall be granted an accused where material evidence favorable to the accused has been discovered since trial. TEX. CODE CRIM. PROC. ANN. art. 40.001. To obtain relief under article 40.001, the defendant must satisfy the following four-prong test: (1) the newly discovered evidence was unknown or unavailable to the defendant at the time of trial; (2) the defendant's failure to discover or obtain the new evidence was not due to the defendant's lack of due diligence; (3) the new evidence is admissible and

not merely cumulative, corroborative, collateral, or impeaching; and (4) the new evidence is probably true and will probably bring about a different result in a new trial. *Arizmendi*, 519 S.W.3d at 149.

The evidence at trial shows that Roberts and Adams were at his house on the evening of January 27 when they began arguing. He decided to take Adams to her mother's house. On the way, while driving on North Houston Rosslyn, between midnight and one o'clock a.m. on January 28, Roberts left Adams on the side of the road. Adams was five feet, one inches tall and eight and one-half months pregnant.

Roberts's mother was in possession of Trevino's statement in 2008. Roberts has not shown that his failure to obtain the statement from his mother was not due to his lack of due diligence. The new evidence must not be based on a witness whose identity and knowledge of the case was known or by the exercise of reasonable diligence might have been known before trial. *Williams v. State*, 549 S.W.2d 734, 736 (Tex. Crim. App. 1977).

Additionally, Trevino's statement is extremely weak. Trevino did not specify the exact date on which she saw the woman. While the location provided by Trevino coincided with Roberts's version of events, Trevino admitted that the only light available was her vehicle's headlights, and she did not stop to speak to the woman. Further, Trevino's description of the woman she saw does not match Adams's description. Roberts has not shown that Trevino's statement will probably bring about a different

result in a new trial. Accordingly, Roberts has not shown entitlement to a new trial based on newly discovered evidence. *See id*.

Motion to Suppress

As a second ground in his motion for new trial, Roberts asserted that the trial court erred in denying his motion to suppress. During the course of his trial, the Fourteenth Court of Appeals issued *Hankston v. State*, holding that, in that case, cell phone tower evidence was admitted in violation of the law and subject to a harm analysis. *See Hankston*, 656 S.W.3d at 917. Roberts argued that *Hankston* is "an important new case that directly impacts" his trial, there is a reasonable expectation of privacy in surveillance information contained in cell phone locations and towers, and the trial court should have excluded the cell phone tower evidence admitted in his trial.

We disagree that *Hankston* had any impact on this case. In *Hankston*, the Fourteenth Court of Appeals initially rejected Hankston's contention that admission of his cell site location information (CSLI) violated the Texas or United States Constitutions and affirmed the conviction. *See Hankston v. State*, 656 S.W.3d at 916. While Hankston's petition for writ of certiorari was pending in the United States Supreme Court, that court decided *Carpenter*, holding that a defendant has an expectation of privacy in CSLI. *Carpenter*, 138 S. Ct. at 2219; *Hankston*, 656 S.W.3d at 917. The *Hankston* case was remanded back to the Fourteenth Court of Appeals to reexamine its Fourth Amendment holding in light of *Carpenter*. *See Hankston v. State*, 582 S.W.3d 278, 279 (Tex. Crim. App.

2019). On remand, the Fourteenth Court of Appeals, applying *Carpenter*, determined that the State's warrantless search of appellant's CSLI violated his Fourth Amendment right against unreasonable searches. *Hankston*, 656 S.W.3d at 917. The *Hankston* court merely applied the 2018 *Carpenter* decision. *See id*. It did not change applicable law in any way.

On the fourth day of the trial, Roberts's counsel made an oral motion to suppress asking the court to suppress "cell site information." She cited the United States Supreme Court's 2018 ruling in *Carpenter* to assert that the State was required to, but did not, obtain a search warrant and argued that admission of the cell site information would be harmful.[1] The trial court heard extensive arguments on the motion, asked numerous questions, and ultimately allowed admission of the objected-to phone records, as well as the testimony of an expert to explain them. Thus, *Carpenter*, the United States Supreme Court case relied on in *Hankston*, was issued before Roberts's trial began and was considered by the trial court in addressing his motion to suppress. In determining whether the visiting judge erred in granting the motion for new trial on the basis that the trial court erred in denying Roberts's motion to suppress, we review the trial court's ruling on the admissibility of the CSLI evidence.

---

[1] The cell phone records, including cell site location information, were lawfully obtained by court order in 2008 pursuant to the version of Texas Code of Criminal Procedure article 18.21 in effect at the time. *See* Act of May 29, 1989, 71st Leg., R.S., ch. 958, § 1, 1989 Tex. Gen. Laws 4026, 4029-30, *amended by* Act of June 14, 2013, 83rd Leg., R.S., ch. 1289, § 6, *repealed by* Act of June 15, 2017, 85th Leg., R.S., § 5.01(2) (current version at TEX. CODE CRIM. PROC. ANN. art. 18B.351-18B.356). In 2013, article 18.21 was amended to require a search warrant for electronic customer data that is in electronic storage, including cell site location information. *See* Act of June 14, 2013, 83rd Leg., R.S., ch. 1289, § 6 (repealed 2017) (current version at TEX. CODE CRIM. PROC. ANN. art. 18B.353-18B.356).

*Harm Analysis*

Because a suspect has a reasonable expectation of privacy in the record of his physical movements, in the absence of exceptions supporting a warrantless search, a search warrant supported by probable cause is generally necessary for the government to obtain a defendant's CSLI records. *Carpenter*, 138 S. Ct. at 2221. We will assume without deciding that the trial court erred in admitting the CSLI evidence because it was obtained without a warrant. *Id.*

When a trial court erroneously denies a motion to suppress and admits evidence obtained in violation of the Fourth Amendment, the error is constitutional and subject to the harmless-error analysis under Rule 44.2(a). TEX. R. APP. P. 44.2(a); *Dixon v. State*, 595 S.W.3d 216, 225-26 (Tex. Crim. App. 2020) (Hervey, J., concurring). Constitutional error is harmful unless the reviewing court determines, beyond a reasonable doubt, that the error did not contribute to the conviction or punishment. TEX. R. APP. P. 44.2(a).

We are required to evaluate the entire record in a neutral manner to determine whether there is a reasonable possibility that the error might have contributed to the conviction. *Wells v. State*, 611 S.W.3d 396, 410-11 (Tex. Crim. App. 2020); *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g). The analysis should not focus on the propriety of the outcome at trial. *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007). Rather, "the question is the likelihood that the constitutional error was actually a contributing factor in the jury's deliberations in arriving at that verdict—

whether, in other words, the error adversely affected 'the integrity of the process leading to the conviction.'" *Id.* The reviewing court considers whether the error moved the jury from a state of non-persuasion to one of persuasion on a particular issue. *Id.*

When deciding whether an error of constitutional dimension contributed to the conviction, courts consider non-exclusive factors, such as, the source and nature of the error, whether the error was emphasized by the State, the probable implications of the error, and the weight the jury would likely have assigned to the error during its deliberations. *Id.* Further, "the presence of overwhelming evidence supporting the jury's verdict can also be a factor in the harmless error calculation." *Wells*, 611 S.W.3d at 410. The appellate court should calculate as much as possible the probable impact of the error on the jury in light of the existence of other evidence. *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000). The reviewing court must be able to declare itself satisfied, to a level of confidence beyond a reasonable doubt, that the error did not contribute to the conviction. *See Scott*, 227 S.W.3d at 690.

According to Roberts, he and Adams had argued, and he left her on the side of the road near his northwest Houston home between midnight and 1:00 a.m. the morning of January 28. He returned to his home without her. On February 7, police interviewed Roberts. Shortly thereafter they obtained his cell phone records. On February 13, unbeknownst to law enforcement, Roberts left the country. Adams's body was found in a shallow grave in a wooded area on Pinedale Road in Walker County on March 26.

1) CSLI Evidence

Law enforcement obtained cell phone records for three phone numbers associated with Roberts. One was used by Roberts's mother, one was used by Karen Frimpong, who was described as Roberts's girlfriend, and one was used by Roberts.

The State's cell phone expert, Breck McDaniel, reviewed cell phone records from Roberts's phone and Frimpong's phone for location information.[2] Regarding a number of calls, he was able to determine which cell sites were used to process those calls. By looking at the time an outgoing call was made using a certain cell site, it can be deduced that phone was within range of that cell site. He explained that a phone can be up to twenty-one miles away from the cell site.

Generally, McDaniel mapped out Roberts's cell site tower usage beginning near his home in northwest Houston on the evening of January 27, 2008. Then, on the morning of January 28, cell site usage indicates the phone traveled north, in the vicinity of Interstate 45, to a point north of Pinedale Road. At 6:27 a.m. on the morning of January 28, Roberts's phone called Frimpong's phone while connected to a cell site in "the Walker County, Huntsville area." Successive cell site connections indicate the phone called Frimpong's phone that morning while traveling in a southerly direction, apparently along Interstate 45 through Huntsville and Conroe and back to north Houston.

---

[2] Although the raw CSLI data was admitted as exhibits at trial, those exhibits required expert interpretation. We therefore focus our analysis on testimony regarding that data.

McDaniel also explained that the cell site information indicates that, on the morning of January 28, Frimpong's phone traveled northward in the vicinity of Interstate 45 and FM 1960 from the Spring area to the north side of Willis, then south through Conroe and back to the immediate Houston area.

The phone records indicate that, on the morning of January 24, Roberts's phone connected to a cell site in south Walker County. There is no explanation in evidence for his presence in that area on that day.

In opening argument to the jury, the prosecutor explained that a cell phone expert would describe how, early in the morning of January 28, Roberts's cell phone was "pinging" in north Huntsville, the nearest tower to where the body was found, and then he drove back home. In closing argument, the prosecutor explained that the timeline "is where the story all comes together." The prosecutor again identified the timeline of Roberts's alleged actions based on the phone records: at 9:05 p.m. on January 27 he was on the northwest side of Houston, and at 6:27 a.m. on January 28 he was near Pinedale Road. After he called Frimpong at 6:27, she headed north. He headed south as she headed north, then their phones "ping" back to Houston.

Although other witnesses briefly touched on the fact that cell phone records exist, McDaniel interpreted the records and presented most of the testimony regarding their significance. His testimony comprised less than 75 pages, including cross-examination, less than ten percent of the State's case-in-chief. The State's summary of CSLI evidence

in closing argument constituted roughly one percent of the State's entire closing argument.

    2)  Other Evidence Supporting the Verdict

Although Roberts stated in his interview with police that he did not want to be associated with Adams, he admitted to having a sexual relationship with her and said there is a chance he was the father of her child. Roberts admitted that he and Adams fought on January 27 before he made her get out of the car. He claimed that he last saw her between midnight on January 27 and one a.m. on January 28. Roberts was apparently the last person to see her alive.

John Nelson testified that, sometime at the end of January or first of February, at between 7:30 and 8:00 a.m., he helped a man whose car was stuck in mud on Pinedale Road. He explained that the car was backed up in the ditch and there was a shovel near the back of the car. He explained that he used his truck and a chain to extract the car. He testified that the car was a black, four-door, smaller sedan. He was not sure of the make, either Toyota or Nissan. Nelson was there by the road, helping the stranded motorist, for fifteen to thirty minutes. In March, when the body was found in the same area, he contacted law enforcement to report his experience. Nelson picked Roberts out of a photo lineup. He also identified Roberts in open court as the man he helped.

Law enforcement searched Roberts's home and found items of clothing similar to those worn by the individual Nelson spoke to. They also found Roberts's black 2005 Nissan Altima at the home.

Other circumstantial evidence also supported the conviction. Evidence showed that Roberts made a large withdrawal from his retirement account on January 24 and wrote a large check to his mom. While there was no evidence tying the money to the murder, the jury could draw reasonable inferences from basic facts. *See Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Since Roberts paid for his plane ticket in cash, the jury could infer Roberts needed cash for his trip to Venezuela. Additionally, a forensic scientist explained that she found black synthetic fibers on Adams's clothing that were microscopically similar in some characteristics to a carpet sample from the trunk of Roberts's car. On February 13, shortly after being interviewed by police and while law enforcement was still investigating Adams's disappearance, Roberts, who was born on the Caribbean island of Dominica, fled to Venezuela and used an alias in Dominica.

Viewing the record in its entirety, in a neutral manner, we conclude that other, properly admitted evidence was a significant basis for the jury to determine Roberts was guilty, and the CSLI evidence provided only a small part of the evidence establishing Roberts's guilt. Other evidence seriously undermined Roberts's credibility. The jury had the benefit of the police interview of Roberts from which the jury could have drawn conclusions about his credibility, to which we defer. *See Thomas*, 428 S.W.3d at 104. The

jury heard eyewitness testimony placing Roberts at the burial site the morning after Roberts and Adams argued. General descriptions of the car and Roberts's clothes matched what was found at his home. Although there were some discrepancies in Nelson's testimony regarding the date and details about the car, the jury is the exclusive judge of witness credibility and the weight to be given their testimony. *See Wesbrook*, 29 S.W.3d at 111. It is also the exclusive province of the jury to reconcile conflicts in the evidence. *Id*. Further, forensic evidence linked the body to Roberts's car. Finally, the jury may draw an inference of guilt from the fact that Roberts fled to Venezuela. *Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007).

Error in the admission of CSLI evidence is harmless beyond a reasonable doubt when, as here, it only incrementally improved the jury's reason to believe other evidence presented by the State. *Dixon*, 595 S.W.3d at 220. After performing the Rule 44.2(a) harm analysis, we hold that, beyond a reasonable doubt, the error in admitting the CSLI evidence did not contribute to Roberts's conviction. *See* TEX. R. APP. P. 44.2(a); *Mosley*, 983 S.W.2d at 259. No reasonable view of the record could support the visiting judge's ruling on the motion for new trial on the basis that cell phone tower evidence was erroneously admitted. *See Thomas*, 428 S.W.3d at 104. Accordingly, Roberts has not shown entitlement to a new trial on the basis that the trial court erroneously denied his motion to suppress. We sustain the State's sole issue.

**Conclusion**

There is no merit in the newly discovered evidence ground or the argument that *Hankston* requires suppression of the CSLI evidence in this case as asserted in Roberts's motion for new trial. Furthermore, Roberts did not show prejudice under applicable harmless error standards. *Arizmendi*, 519 S.W.3d at 148. Accordingly, the visiting judge abused his discretion in granting the motion. *See Najar*, 618 S.W.3d at 372. We reverse the trial court's order granting Roberts's motion for a new trial and render judgment reinstating the trial court's judgment of conviction and Roberts's sentence. *See* TEX. R. APP. P. 43.3.

STEVE SMITH
Justice

Before Chief Justice Gray,
     Justice Johnson, and
     Justice Smith
Reversed and rendered
Opinion delivered and filed July 11, 2024
Publish
[CRPM]

